## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

JANE DOE, (H.E.W.), AN INDIVIDUAL   §
                      *Plaintiff*   §
                          §
V.   §     **Civil Action No.: 1:23-cv-01456**
                          §
RADISSON HOSPITALITY, INC.;   §
ARBORETUM HOSPITALITY, INC.;   §
COUNTRY INN & SUITES BY RADISSON,   §
INC.; CHOICE HOTELS INTERNATIONAL,   §
INC.;   §
AMIN DEVELOPMENT CORPORATION;   §
VHGI, INC.; VANTAGE FRANCHISING   §
INC.; RED LION HOTELS CORPORATION;   §
OM NAMA MAHA LAXMI, L.L.C.;   §
WYNDHAM HOTELS & RESORTS, INC.;   §
WYNDHAM HOTEL GROUP, LLC;   §
BAYMONT FRANCHISE SYSTEMS, INC.;   §
SUPER 8 WORLDWIDE, INC.; LONGHORN   §
HOTELS, L. P.; SARI ASSOCIATES, L.L.C.;   §
DAYS INNS WORLDWIDE, INC.;   §
RADIANT PROPERTIES, L.L.C.;   §
A & D HOTEL, L.L.C.,   §
                          §
                *Defendants*   §

## PLAINTIFF'S ORIGINAL COMPLAINT

      COMES NOW Plaintiff Jane Doe (H.E.W.), by and through the undersigned counsel, and

respectfully submits her amended complaint for damages and makes the following averments.

## SUMMARY

      1.      Jane Doe (H.E.W.) files this civil lawsuit seeking compensation for the harm she

suffered as a result of the sex trafficking she endured in hotels owned, operated, maintained, and

controlled by Defendants and their agents and employees.

      2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining,

patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1]

3.      Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7.      As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (H.E.W.), with minimal risk of detection or interruption.

8.      Defendants continued supporting traffickers, including Jane Doe (H.E.W.)'s

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] 18 U.S.C. §1591(e)(3).

traffickers, despite evident and apparent signs of widespread and ongoing sex trafficking at their hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## PARTIES

9.      Jane Doe (H.E.W.) is a natural person who is a victim of sex trafficking within the meaning of 18 U.S.C. §§1591 and 1595(a). She currently resides in Travis County, Texas.

**Country Inn & Suites**

10.      Defendant Arboretum Hospitality, Inc. is a for-profit Texas limited liability company. It can be served by service on its registered agent Rajesh B. Patel located at 7400 IH 35 North, Austin, Texas 78752. Upon information and belief at all relevant times Arboretum Hospitality, Inc. owned, operated, controlled, and/or managed the Country Inn & Suites hotel located at 7400 North Interstate 35 Frontage Road, Austin, Texas 78752 (hereinafter Austin Country Inn), and entered into a franchising agreement to operate the property as a Country Inn & Suites branded property. It will be referred to as "Arboretum" or "Country Inn Franchisee Defendant."

11.      Defendant Country Inn & Suites by Radisson, Inc. is a for-profit Minnesota corporation with its principal place of business in Minnesota. Until September 2017, it conducted business under the corporate name Country Inn & Suites By Carlson, Inc. It is a wholly-owned indirect subsidiary of Radisson Hospitality, Inc. It can be served by its registered agent Cogency Global, Inc., 1601 Elm Street, Suite 4360, Dallas, TX 75201.

12.      Defendant Radisson Hospitality, Inc. is a for-profit Minnesota corporation with its principal place of business in Minnesota. Until 2017, it conducted business under the corporate name Carlson Hotels, Inc. It can be served by its registered agent Cogency Global, Inc., 1601 Elm

Street, Suite 4360, Dallas, TX 75201.

13.    Defendant Choice Hotels International, Inc. ("Choice") is a for-profit Delaware corporation with its principal place of business in Maryland. It can be served through its registered agent United States Corporation Company, 211 E. 7th Street, Suite 620, Austin, TX 78701. On August 11, 2022, Choice purchased Radisson Hospitality, Inc. and all of its subsidiaries. Radisson is now a wholly owned subsidiary of Choice. Accordingly, Choice retains successor liability for wrongful acts of its predecessors Radisson Hospitality, Inc. and Country Inn & Suites by Radisson, Inc. All references to Choice in this Complaint include references to the acts and omissions of its predecessor.

14.    Defendants Country Inn & Suites by Radisson, Inc., Radisson Hospitality, Inc., and Choice Hotels International, Inc. will be collectively referred to as "Country Inn Brand Defendants." Upon information and belief, either directly or through the acts of predecessors for which they are responsible, owned, operated, controlled, and/or managed the Austin Country Inn.

**Americas Best Value Inn**

15.    Defendant Amin Development Corporation is a for-profit Texas corporation.  It can be served by service on its registered agent, Niketa J. Amin located at 1808 Harvest Dance Dr., Leander, Texas 78641. Upon information and belief at all relevant times it owned, operated, controlled, and/or managed the Americas Best Value Inn located at 909 E. Koenig Lane, Austin, Texas 78751 (hereinafter "Austin ABV"). It will be referred to as "Amin" or "ABV Franchisee Defendant."

16.    VHGI, Inc., formerly known as Vantage Hospitality Group, Inc. is a Florida corporation with its principal place of business in Coral Springs, Florida. It may be served through its registered agent: Corporation Service Company, 211 E. 7th St, Suite 620, Austin, TX 78701.

17.     Vantage Franchising Inc. is a Florida corporation with its principal place of business in Coral Springs, Florida. It may be served through its registered agent: Judith A. Jarvis, 3300 N. University Dr., Suite 500, Coral Springs, FL 33065. Upon information and belief, it was the franchisor of Americas Best Value Inn brand hotels until 2016. VHGI, Inc. is its parent.

18.     Red Lion Hotels Corporation ("Red Lion") is a Maryland corporation with its principal place of business Denver, Colorado. It may be served through its registered agent: Corporation Service Company, 211 E. 7th St, Suite 620, Austin, TX 78701. In 2016, Red Lion acquired the brands and brand operations of VHGI, Inc. and its subsidiaries. This included all or substantially all of VHGI, Inc.'s operating assets, including the Americas Best Value brand, which Red Lion continued to operate at locations around the United States, including in Texas. Upon information and belief, Red Lion is a successor to the liability of VHGI, Inc. and its predecessors, including Vantage Franchising Inc., for acts and omissions related to the subject Americas Best Value Inn. All references to "Red Lion" include references to the acts and omission of its predecessors for which it is liable. Upon information and belief, at relevant times Red Lion— through its predecessors—owned, operated, controlled, and/or managed the Austin ABV.

19.     VHGI, Inc., Vantage Franchising Inc., and Red Lion Hotels Corporation will be referred to collectively as "ABV Brand Defendants." Upon information and belief, either directly or through the acts of predecessors for which they are responsible, owned, operated, controlled, and/or managed the Austin ABV.

**Baymont Inn & Suites**

20.     Defendant Om Nama Maha Laxmi, LLC is a Texas limited liability company. It can be served by service on its registered agent, Thomas J. Irons located at 1790 Preston Rd. Ste 650, Dallas, Texas 75252. Upon information and belief, it owned, operated, controlled, and/or

managed the Baymont Inn & Suites located at 7100 North Interstate Highway 35, Austin, Texas 78752 ("hereinafter Austin Baymont"). It will be referred to as "Om Nama" or "Baymont Franchisee Defendant."

21.     Wyndham Hotels & Resorts, Inc., ("WHR") is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. It can be served by its registered agent Corporate Creations Network Inc., 1521 Concord Pike, Suite 201, Wilmington, DE 19803. Defendant WHR is the successor entity to the hotel business of Wyndham Worldwide Corporation and its former subsidiaries. Defendant WHR is responsible, as successor, for all liabilities of Wyndham Worldwide Corporation and its predecessor subsidiaries related to franchising, controlling, and operating the Baymont Inn & Suites located at 7100 North Interstate Highway 35, Austin, Texas 78752. All references to WHR include the acts and omissions of predecessor entities for which WHR is responsible, including Wyndham Worldwide Corporation and its former subsidiaries.

22.     Wyndham Hotel Group, LLC ("WHG") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. It can be served by its registered agent Corporate Creations Network Inc., 1521 Concord Pike, Suite 201, Wilmington, DE 19803. Upon information and belief, WHG is a wholly owned subsidiary of WHR and a former subsidiary of Wyndham Worldwide Corporation.

23.     Baymont Franchise Systems, Inc. ("Baymont") is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. It can be served by its registered agent Corporate Creations Network Inc., 5444 Westheimer #1000, Houston, TX 77056. Upon information and belief, it is a direct subsidiary of WHG, an indirect subsidiary of WHR, and a former subsidiary of Wyndham Worldwide Corporation.

**Days Inn**

24.    Defendant Radiant Properties, LLC. is a Texas limited liability company. It can be served by service on its <u>registered agent Austen Harvey located at 17 Highland Lane, Canyon, Texas 79015.</u> Upon information and belief, they owned, operated, controlled, and/or managed the Days Inn located at 820 East Anderson Lane, Austin, Texas 78752 (hereinafter "Austin Days Inn"). It will be referred to as "Radiant" or "Days Inn Franchisee Defendant."

25.    Days Inns Worldwide, Inc. ("DIW") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. It can be served by its registered agent Corporate Creations Network Inc., 5444 Westheimer #1000, Houston, TX 77056.

26.    Defendant WHR is responsible, as successor, for all liabilities of Wyndham Worldwide Corporation and its predecessor subsidiaries related to franchising, controlling, and operating the Austin Days Inn. Upon information and belief, DIW is a direct subsidiary of WHG, an indirect subsidiary of WHR, and a former subsidiary of Wyndham Worldwide Corporation.

**Super 8**

27.    Defendant Longhorn Hotels, L.P. is a Texas company. It can be served by service on its <u>registered agent, Yogesh Kumar, 1000 South Bell Boulevard, Cedar Park, Texas 78613.</u> Upon information and belief it owned, operated, controlled, and/or managed the Super 8 by Wyndham, Austin Airport North, located at 5606 East 51st Street, Austin, Texas 78723 (hereinafter "Airport Super 8"). It will be referred to as "Longhorn" or "Airport Super 8 Franchisee Defendant."

28.    Defendant Sari Associates, L.L.C., is a Texas limited liability company. It can be served by service on its <u>registered agent, Arun J. Jain, 8128 North Interstate 35, Austin, Texas 78753.</u> Upon information and belief it owned, operated, controlled, and/or managed the Super 8

by Wyndham, Austin North University, located at 8128 North Interstate Highway 35, Austin, Texas 78753 (hereinafter "University Super 8"). It will be referred to as "Sari" or "University Super 8 Franchisee Defendant."

29.     Super 8 Worldwide, Inc. ("S8W") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. It can be served by its registered agent Corporate Creations Network Inc., 5444 Westheimer #1000, Houston, TX 77056.

30.     Defendant WHR is responsible, as successor, for all liabilities of Wyndham Worldwide Corporation and its predecessor subsidiaries related to franchising, controlling, and operating the Airport Super 8 and University Super 8. Upon information and belief, S8W is a direct subsidiary of WHG, an indirect subsidiary of WHR, and a former subsidiary of Wyndham Worldwide Corporation.

31.     Defendants Wyndham Hotels & Resorts, Inc., Wyndham Hotel Group, LLC, Baymont Franchise Systems, Inc., Days Inns Worldwide Inc., and Super 8 Worldwide, Inc. will be referred to collectively as "Wyndham" or "Wyndham Brand Defendants." Upon information and belief, either directly or through the acts of predecessors for which they are responsible, owned, operated, controlled, and/or managed the Austin Baymont, Austin Days Inn, Airport Super 8, and University Super 8 through the Wyndham franchising system.

32.     Defendants Om Nama, Radiant, Longhorn, and Sari will be referred to collectively as "Wyndham Franchisee Defendants."

33.     The Country Inn Brand Defendants, ABV Brand Defendants, and Wyndham Brand Defendants will be referred to collectively as "Franchisor Defendants."

34.     Defendants Arboretum, Amin, Om Nama, Radiant, Longhorn, and Sari will be referred to collectively as "Franchisee Defendants."

**Orangewood Inn and Suites**

35.    Defendant A & D Hotel, L.L.C. ("A&D"), is a Texas limited liability company.  It can be served by service on its registered agent Amit Desai, 9121 North Interstate 35, Austin, Texas 78753. It will be referred to as "Orangewood Inn Defendant."

36.    At all relevant times, A&D owned, operated, controlled, and/or managed the Orangewood Inn & Suites located at 9121 North Interstate Highway 35, Austin, Texas 78753.

<u>**JURISDICTION AND VENUE**</u>

37.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

38.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the Western District of Texas, and all Defendants are residents of Texas.

39.    Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Western District of Texas.

40.    A significant part of the trafficking alleged happened in this District.

<u>**FACTS**</u>

**I.    Jane Doe (H.E.W.) Was a Victim of Unlawful Sex Trafficking at Hotels Owned, Operated, Managed, and Controlled by Defendants.**

41.    Jane Doe (H.E.W.)'s trafficking began in summer 2012 when she met her first trafficker at a friend's party. The trafficker provided her with drugs and lied about what he was requiring her to do. She had multiple traffickers in the years she was trafficked. Her traffickers controlled her through physical violence and force and made her engage in commercial sex acts for their financial benefit. Her traffickers forced her to pose for photos and then posted ads on her

behalf without her consent. She did not want to engage in commercial sex acts but when she refused, they threatened her and she feared them. Jane Doe (H.E.W.) was trafficked until February 2014.

42.    Jane Doe (H.E.W.)'s traffickers moved her between hotels in the Austin area, coercing her to perform commercial sex services for their benefit.

43.    Jane Doe (H.E.W.)'s sexual exploitation occurred at hotels owned, operated, managed, and controlled by Defendants, and each of the Defendants participated in a venture that facilitated this trafficking.

44.    Jane Doe (H.E.W.)'s trafficking had profound effects on her, consistent with well-recognized "red flags" of trafficking in the hospitality industry, that were obvious and apparent to the staff and management of Defendants' hotels, including effects on her appearance, demeanor, movements throughout the hotel, and her interactions with her traffickers, hotel staff, and others. Observing these effects provided Defendants with notice that H.E.W. was being continually subjected to coercion, control, and exploitation.

45.    Jane Doe (H.E.W.) remained under the continuous control of her traffickers through at least February 2014.

## II.    The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem

46.    The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what each of the Defendants knew or should have known regarding the trafficking at their hotel properties, including the trafficking of Jane Doe (H.E.W.).

47.    Today, sex slavery is pervasive in the United States, and hotels are the primary

place where it happens.[3] For years, sex traffickers have "been able to reap these profits with little risk when attempting to operate within hotels."[4] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[5] Hotels have been found to account for over 90% of commercial exploitation of children.[6]

48.    The New York Attorney General has recognized that traffickers rely on the hospitality industry for moving, controlling, and delivering victims of commercial sex or forced labor and that, as a result, hotels have an obligation to report, respond to, and prevent human trafficking.[7]

49.    Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

50.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[8]

---

[3] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*
[4]    *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.
[5] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.
[6] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).
[7] https://wutv29.com/news/local/nys-ag-reminds-hotels-of-obligation-to-help-human-trafficking-victims-as-travel-increases
[8] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023); National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for*

51.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[9]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

---

*Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

[9] *See Id.*

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.

52.    The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion. It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

53.    The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[10]

54.    In 2013, the State of New York implemented a Human Trafficking Intervention Court because "there was a recognition that most of the people engaged in commercial sex work are not involved voluntarily."[11]

55.    All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

56.    Toolkits specific to the hotel industry have been developed, which help hotel staff

---

[10] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

[11] https://www.wbfo.org/local/2018-08-09/western-new-york-no-stranger-to-human-trafficking

in every position identify and respond to signs of sex trafficking.[12] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

57.    There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.[13]

58.    The most effective weapon against sexual exploitation and human trafficking is education and training.[14]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[15]

59.    This same conclusion is echoed by others who seek to eliminate sex trafficking in

---

[12] Department of Homeland Security, *Blue Campaign Toolkit*, available at:
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[13] https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf
[14] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[15] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[16]  In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

60.    Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

61.    Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

62.    Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (H.E.W.)'s trafficking, that sex trafficking was ongoing and widespread at the Defendant's hotel(s).

63.    Unfortunately for Jane Doe (H.E.W.), Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual

---

[16] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

exploitation of victims like Jane Doe (H.E.W.).

### III. The TVPRA violations at the Austin Country Inn.

64.     In 2013, Jane Doe (H.E.W.) was repeatedly trafficked at the Austin Country Inn. The Country Inn Franchisee Defendants and the Country Inn Brand Defendants (collectively "Country Inn Defendants") benefited from the rental of the rooms that were used to sexually exploit victims, including Jane Doe (H.E.W.). The Country Inn Defendants knew or should have known they were facilitating sex trafficking at the Austin Country Inn, including the trafficking of Jane Doe (H.E.W.).

### A.  The Country Inn Defendants' Knowledge of Sex Trafficking

65.     The Country Inn Defendants have known, since well before Jane Doe (H.E.W.)'s trafficking, that there was widespread sex trafficking at Radisson branded hotels, including Country Inn branded hotels.

> *1) Sex Trafficking has long been prevalent at Radisson Properties, and the Country Inn Defendants have known it*

66.     Upon information and belief, at all relevant times the Country Inn Defendants have, acting directly and through affiliates, adopted a centralized approach to exercising control over Radisson properties, including Country Inn properties. This extends to the hotels' approach to human trafficking.

67.     Sex trafficking was prevalent at Radisson branded properties, including Country Inn properties, both on a national scale and specifically in the State of Texas.

68.     Public information, including scores of news stories and online reviews, confirms both the widespread sex trafficking problem at Radisson branded hotels and the Country Inn Defendants' knowledge of this sex trafficking. Upon information and belief, the Country Inn Defendants monitored both news stories and online reviews for indicia of criminal activity,

16

including sex trafficking.

> *2) The Country Inn Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Austin Country Inn*

69.     The Country Inn Defendants also knew or should have known that sex trafficking was widespread and ongoing at the Austin Country Inn specifically.

70.     Traffickers, including Jane Doe (H.E.W.)'s traffickers, repeatedly chose to use the Austin Country Inn.

71.     They selected this hotel because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking.

72.     There were obvious and apparent signs of this widespread trafficking activity, consistent with the well-known "red flags" of sex trafficking in the hospitality industry, that the Country Inn Defendants knew or should have known about.

73.     All knowledge from the hotel staff at the Austin Country Inn is imputed to the Country Inn Defendants. The Country Inn Defendants knew about this widespread and ongoing trafficking at the Austin Country Inn, including the trafficking of Jane Doe (H.E.W.), through the direct observations of hotel staff, including management-level staff, and information otherwise relayed to this staff by other staff members, guests, and other sources.

> *3) The Country Inn Defendants knew Jane Doe (H.E.W.) was being trafficked because of the apparent and obvious "red flags" of sex trafficking*

74.     During the period that Jane Doe (H.E.W.) was trafficked at the Austin Country Inn, there were obvious signs, observed by hotel staff, that her trafficker was engaged in sex trafficking:

    a.  The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards.
    b.  The "Do Not Disturb" door hanger was used very frequently.
    c.  Housekeeping staff was often prevented from entering the room for regular cleaning, towel exchange and other standard room services.
    d.  There was heavy foot traffic in and out of Jane Doe (H.E.W.)'s room involving men

who were not hotel guests. This traffic was visible to hotel staff.

    e.   Jane Doe (H.E.W.) had several johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

    f.   When housekeeping was allowed in and after Jane Doe (H.E.W.) checked out, hotel cleaning staff would have noticed sex paraphernalia like condom wrappers and lubricant, as well as drug paraphernalia.

    g.   Other girls were being trafficked at the same hotel at the same time as H.E.W. by her trafficker and other traffickers.

    h.   Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

75.    Based upon information and belief, multiple employees, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

76.    As such, the Country Inn Defendants knew or were willfully blind to the fact that Jane Doe (H.E.W.) was being trafficked at the subject Country Inn.

77.    Given these obvious signs, Country Inn Defendants knew or should have known about the trafficking of Jane Doe (H.E.W.) based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

78.    Defendants also knew or should have known about Jane Doe (H.E.W.)'s trafficking based on the other methods, listed above, that they used to monitor and supervise the subject properties.

**B. The Country Inn Defendants facilitated sex trafficking, including the trafficking of Jane Doe (H.E.W.)**

79.    The Country Inn Defendants facilitated widespread sex trafficking at the Austin Country Inn, including the trafficking of Jane Doe (H.E.W.).

    *1)  The Country Inn Franchisee Defendants facilitated sex trafficking at the Austin Country Inn.*

80.    The Country Inn Franchisee Defendants were responsible for the acts, omissions, and knowledge of all employees of the Austin Country Inn when operating the hotel because these

acts and omissions were committed in the scope and course of employment, because they ratified these acts and omissions, and because they failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to them, of sex trafficking occurring at this hotel.

81.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Austin Country Inn, the Country Inn Franchisee Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

82.    The Country Inn Franchisee Defendants knew or were willfully blind to the fact that Jane Doe (H.E.W.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing a venue and tools, in the form of hotel rooms and related services, to facilitate Jane Doe (H.E.W.)'s sexual exploitation.

83.    The Country Inn Franchisee Defendants also facilitated widespread trafficking at the Austin Country Inn, including the trafficking of Jane Doe (H.E.W.), in ways including:

   a.  following inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to on-premises crime and specifically human trafficking;

   b.  choosing not to report known or suspected criminal activity, including sex trafficking, to law enforcement;

   c.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

84.    Through these actions, the Country Inn Franchisee Defendants formed an implicit agreement with traffickers and encouraged them to return to the Austin Country Inn to exploit victims including Jane Doe (H.E.W.).

   2)  *The Country Inn Brand Defendants facilitated sex trafficking at* the Austin Country Inn

85.    On information and belief, the Country Inn Brand Defendants directly participated in renting rooms to traffickers at the Austin Country Inn, including to Jane Doe (H.E.W.)'s traffickers, in ways including, but not limited to, the following:

a.    The Country Inn Brand Defendants controlled all details of the guest reservation, check-in, and payment processes through both its management and control over all systems used for those processes and its adoption of detailed and specific policies governing the means and methods hotel staff used for each of these processes.

b.    The Country Inn Brand Defendants directly made reservations for rooms at the Austin Country Inn and accepted payment for those rooms through a central reservation system that it controlled and operated, and which franchisee was required to use. The Country Inn Brand Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement.

c.    The Country Inn Brand Defendants controlled extension of existing room reservations and guests had to contact the Country Inn Brand Defendants to extend reservations.

d.    The Country Inn Brand Defendants controlled the payment methods that would be accepted and had access to information about which guests used which payment methods through its backend access to the reservation and payment systems they required franchisee to use.

e.    The Country Inn Brand Defendants controlled policies and protocols for guest identity verification at the time of check in.

f.    The Country Inn Brand Defendants controlled room rates, required discounts, mandatory fees, and rewards programs.

g.    The Country Inn Brand Defendants controlled and restricted the ability of hotel staff to refuse or cancel a reservation.

h.    The Country Inn Brand Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Austin Country Inn until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

i.    The Country Inn Brand Defendants required franchisee to use their property management system, which was owned, maintained, controlled, and operated by the Country Inn Brand Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

86.    Despite having active and constructive knowledge of the widespread sex trafficking at the Austin Country Inn, the Country Inn Brand Defendants continued renting rooms to

traffickers, including the trafficker of Jane Doe (H.E.W.).

87.    Upon information and belief, the Country Inn Brand Defendants participated directly in aspects of the operation of the Austin Country Inn that influenced whether and to what extent trafficking occurred at the hotel, including, but not limited to, the following:

   a.  The Country Inn Brand Defendants retained control over and responsibility for training related to detecting and responding to human trafficking at the Austin Country Inn. The Country Inn Brand Defendants retained controlled over whether training was provided, when it was provided, who provided it, how it was provided, the content of the training, and how effectiveness of the training was assessed.

   b.  The Country Inn Brand Defendants retained control over and responsibility for setting, supervising, overseeing, and enforcing all policies and protocols regarding detecting and responding to human trafficking at the Austin Country Inn.

   c.  The Country Inn Brand Defendants retained control over use of brand-wide data analytics to assess and address human trafficking Embassy Suites hotels.

   d.  The Country Inn Brand Defendants assumed the responsibility to identify geographic locations and specific hotel properties that had a heightened risk of human trafficking and to enact appropriate measures to respond to properties with higher risk.

   e.  The Country Inn Brand Defendants assumed the responsibility to alert specific hotels, including the Austin Country Inn, of circumstances, prompting a high risk for trafficking activity.

   f.  The Country Inn Brand Defendants assumed responsibility for guest safety by collecting and maintaining and images or footage from closed circuit television (CCTV) at hotel properties.[17]

   g.  The Country Inn Brand Defendants maintained control over all details of the terms under which franchised hotels, including the Austin Country Inn, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Country Inn Brand Defendants controlled whether certain sites known to be frequently used to advertise victims for trafficking would be blocked from the hotel's network.

   h.  The Country Inn Brand Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Austin Country Inn, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor

---

[17] https://www.hilton.com/en/p/global-privacy-statement/#CollectionGenerally

guest safety issues through housekeeping services.

    i.   The Country Inn Brand Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Austin Country Inn including trends that would reveal patterns consistent with human trafficking.

88.    Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Austin Country Inn, the Country Inn Brand Defendants continued participating in a venture at that hotel, with their franchisee and the hotel staff, in a way that the Country Inn Brand Defendants knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following:

    a.   The Country Inn Brand Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and front-line hotel staff regarding issues related to human trafficking.

    b.   The Country Inn Brand Defendants implicitly condoned and endorsing its franchisee's repeated decisions not to report or respond to trafficking appropriately.

    c.   The Country Inn Brand Defendants ignored policies that they had purportedly enacted and implemented.

    d.   The Country Inn Brand Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Austin Country Inn.

    e.   Despite having specific knowledge of policies that would significantly reduce sex trafficking at the Austin Country Inn, the Country Inn Brand Defendants declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or draw negative public attention by acknowledging the ongoing sex trafficking at Country Inn Branded properties.

    f.   The Country Inn Brand Defendants attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

    g.   The Country Inn Brand Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability.

    h.   The Country Inn Brand Defendants adopted and required franchisee to adopt check in procedures that failed to ensure all hotel guests were appropriately identified and, instead, allowed guests to use the hotel with minimal risk of traceability.

     i.   The Country Inn Brand Defendants continued to allow the Austin Country Inn to profit by using brand trademarks despite actual or constructive knowledge of ongoing sex trafficking in that hotel. Lending the perceived legitimacy of the Country Inn Brand affirmatively facilitated sex trafficking by providing a venue where sex trafficking could occur with minimal risk of detection by law enforcement or traceability.

89.    If the Country Inn Brand Defendants had exercised reasonable diligence when operating the Austin Country Inn and in the areas over which they retained control, then the Country Inn Brand Defendants would have prevented the Austin Country Inn from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.). Instead, the Country Inn Brand Defendants engaged conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.).

### C. The Country Inn Defendants' ventures at the Austin Country Inn

90.    Through the conduct described above, the Country Inn Franchisee Defendants and the Country Inn Brand Defendants knowingly benefited from engaging in a venture with sex traffickers at the Austin Country Inn, including Jane Doe (H.E.W.)'s trafficker, as follows:

    a.   The Country Inn Franchisee Defendants and the Country Inn Brand Defendants both received benefits, including increased revenue, every time a room was rented at the Austin Country Inn.

    b.   This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Austin Country Inn, which the Country Inn Franchisee Defendants and the Country Inn Brand Defendants knew or should have known about.

    c.   The Country Inn Franchisee Defendants and the Country Inn Brand Defendants associated with traffickers, including Jane Doe (H.E.W.)'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

    d.   The Country Inn Franchisee Defendants and the Country Inn Brand Defendants had a mutually beneficial relationship with the traffickers at the Austin Country Inn, fueled by sexual exploitation of victims, including Jane Doe (H.E.W.).

    e.   Sex traffickers, including Jane Doe (H.E.W.)'s traffickers, frequently used the

Austin Country Inn for their trafficking because of an implicit understanding that the Austin Country Inn was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of the Country Inn Franchisee Defendants and the Country Inn Brand Defendants facilitating that trafficking as described throughout this Amended complaint. This resulted in benefits, including increased revenue, for the Country Inn Franchisee Defendants and the Country Inn Brand Defendants.

f.  Both the Country Inn Franchisee Defendants and the Country Inn Brand Defendants participated in this venture through the conduct described throughout this Amended complaint as they were jointly responsible for relevant aspects of hotel operations.

g.  Jane Doe (H.E.W.)'s trafficking at the Austin Country Inn was a result of the Country Inn Franchisee Defendants and the Country Inn Brand Defendants' participation in a venture with criminal traffickers. If the Country Inn Franchisee Defendants and the Country Inn Brand Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (H.E.W.)'s trafficking at the Austin Country Inn.

91.  Through the conduct described above, the Country Inn Brand Defendants also knowingly benefited from engaging in a commercial venture with the Country Inn Franchisee Defendants operating the Austin Country Inn as follows:

a.  The Country Inn Brand Defendants associated with the Country Inn Franchisee Defendants to operate the Austin Country Inn.

b.  Pursuant to the terms of the franchising agreement, both the Country Inn Franchisee Defendants and the Country Inn Brand Defendants received financial benefits from operating the Austin Country Inn, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

c.  By participating in a venture that facilitated sex trafficking, also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Austin Country Inn specifically.

d.  This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of the Country Inn Franchisee Defendants and the widespread sex trafficking at the Austin Country Inn.

e.  Despite their actual or constructive knowledge that the venture was engaged in

violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Country Inn Brand Defendants participated in the venture by continuing to associate with Franchisee Defendant to operate the Austin Country Inn in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe (H.E.W.).

f.  Jane Doe (H.E.W.)'s trafficking at the Austin Country Inn was a result the Country Inn Franchisee Defendants and the Country Inn Brand Defendants facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Austin Country Inn. Had the Country Inn Franchisee Defendants and the Country Inn Brand Defendants not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), they would not have received a benefit from Jane Doe (H.E.W.)'s trafficking at the Austin Country Inn.

**D.  The Country Inn Franchisee Defendants and staff at the Austin Country Inn acted as actual agents of the Country Inn Brand Defendants.**

92.  The Country Inn Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Days Inns Franchisee Defendants and staff at Country Inn & Suites, which are the Country Inn Brand Defendants' actual agents or subagents.

93.  The Country Inn Brand Defendants subjected Country Inn and Suites Franchisee Defendants to detailed standards and requirements regarding the operation of Country Inn and Suites through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Country Inn Brand Defendants. These written standards, protocols, and requirements:

a.   did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Country Inn Franchisee Defendants used at Country Inn & Suites; and

b.  covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

c.  dictated the specific manner in which Country Inn Franchisee Defendants and hotel staff must carry out most day-to-day functions at Country Inn; and

d.  significantly exceeded what was necessary for the Country Inn Brand Defendants

to protect their registered trademarks.

94.    The Country Inn Brand Defendants obscured the full extent of control it exercises over franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals.

95.    In addition to the ways described above, upon information and belief, the Country Inn Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over Country Inn Franchisee Defendants' day-to-day operation of the Country Inn and Suites, including the following ways:

    a.  The Country Inn Brand Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Country Inn Brand Defendants to protect their registered trademarks;

    b.  The Country Inn Brand Defendants maintained a team of regionally based trainers to provide training at branded hotels. The Country Inn Brand Defendants provided training for hotel management and select hotel staff on-site at the Country Inn and at locations selected by the Country Inn Brand Defendants;

    c.  The Country Inn Brand Defendants provided hotels staff with training it created through an online learning platform, Country Inn University, they controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

    d.  The Country Inn Brand Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

    e.  The Country Inn Brand Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

    f.  The Country Inn Brand Defendants maintained oversight in hiring, disciplining, and terminating hotel management and employees;

    g.  The Country Inn Brand Defendants required franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

h. For certain products and services that franchisee was required to purchase to operate the Country Inn, the Country Inn Brand Defendants designated approved vendors and prohibited franchisee from purchasing goods and services from anyone other than an approved vendor;

i. The Country Inn Brand Defendants required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

j. The Country Inn Brand Defendants set required staffing levels for the Country Inn;

k. The Country Inn Brand Defendants established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

l. The Country Inn Brand Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

m. The Country Inn Brand Defendants provided benefits for employees of franchised hotels;

n. The Country Inn Brand Defendants controlled channels for guests to report amended complaints or provide feedback regarding the Country Inn and directly participated in the response and/or supervised and the response to customer amended complaints or other feedback. Country Inn retained the right to provide refunds or other compensation to guests and to require Country Inn Franchisee Defendants to pay associated costs;

o. The Country Inn Brand Defendants generated reports and analysis of guest amended complaints and online reviews for the Country Inn;

p. The Country Inn Brand Defendants set detailed requirements for insurance that Country Inn Franchisee Defendants must purchase;

q. The Country Inn Brand Defendants exercised or retained control over the franchisee's day-to-day accounting and banking practices;

r. The Country Inn Brand Defendants regularly audited the books and records of Country Inn Franchisee Defendants;

s. The Country Inn Brand Defendants conducted frequent and unscheduled inspections of the Country Inn;

t. The Country Inn Brand Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if franchisee violated any of the Country Inn Brand Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Country Inn;

u. The Country Inn Brand Defendants controlled all marketing for the Country Inn & Suites, directly provided marketing services, and prohibited Country Inn Franchisee Defendants from maintaining any online presence unless specifically reviewed and approved by Country Inn;

v. The Country Inn Brand Defendants exercised or retained control over all aspects of building and facility design;

w. The Country Inn Brand Defendants imposed detailed recordkeeping and reporting requirements on Country Inn Franchisee Defendants regarding virtually all aspects of hotel operations;

x. The Country Inn Brand Defendants supervised and controlled day-to-day operations of the Country Inn through detailed information and extensive reports that it obtained through the property management system and other software systems it required Country Inn Franchisee Defendants to use;

y. The Country Inn Brand Defendants required the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis; and

z. The Country Inn Brand Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

96. Upon information and belief, the Country Inn Brand Defendants had the right to and did enforce its control over Country Inn Franchisee Defendants through various methods, including:

a. the right to conduct detailed inspections of the Country Inn;

b. monitoring or auditing the Country Inn Franchisee Defendants for compliance with policies and expectations;

c. directing Country Inn Franchisee Defendants to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d. mandating training and education for franchisees and/or hotel staff;

    e.   employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

    f.   the right to impose fines or penalties;

    g.   the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services; and

    h.   the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

**E.  Relationship among the Country Inn Brand Defendants**

97.    Choice is responsible, as a successor, for the acts and omissions of its predecessors, including Country Inn & Suites by Radisson, Inc. and Radisson Hospitality, Inc., with respect to operation, franchising, and control of the Austin Country Inn.

98.    Upon information and belief, in 2022, Choice acquired the brands and brand operations of Radisson and its subsidiaries. This included all or substantially all of Radisson's operating assets, including the Country Inn brand, which Choice continued to operate at locations around the United States, including in Texas. Upon information and belief, Choice agreed to assume responsibility for liabilities of Radisson, its predecessors, and its former subsidiaries regarding the franchising, control, and operation of the Austin Country Inn.

99.    Upon information and belief, Choice agreed to assume responsibility for liabilities of Radisson, its predecessors, and its former subsidiaries regarding the franchising, control, and operation of the Austin Country Inn.

100.    Upon information and belief, the rights, and obligations with respect to the operation, franchising, and control of the Austin Country Inn were shared and fulfilled jointly by the Country Inn Brand Defendants. Upon information and belief, each of the Country Inn Brand Defendants shared revenue related to operation, franchising, and control of the Austin Country Inn

and each of the Country Inn Brand Defendants experienced a direct benefit from the rental of rooms to traffickers at the Austin Country Inn. Upon information and belief, each of the Country Inn Brand Defendants participated directly in the ventures franchising, controlling, operating, and renting rooms at the Austin Country Inn in the ways outlined more specifically above. Further, upon information and belief, each of the AB Brand Defendants knew or should have known that these ventures were engaged in facilitation of sex trafficking.

101.    Upon information and belief, each of the Country Inn Brand Defendants participated in a joint venture regarding the operation, control, and franchising of the Austin Country Inn. The Country Inn Brand Defendants, who were corporate affiliates subject to common ownership and control, were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture with respect to the operation, franchising, and control of the Austin Country Inn.

## IV.    The TVPRA violations at the Austin ABV

102.    In 2013, Jane Doe (H.E.W.) was repeatedly trafficked at the Austin ABV. The ABV Franchisee Defendants and the ABV Brand Defendants (collectively "ABV Defendants") benefited from the rental of the rooms that were used to sexually exploit victims, including Jane Doe (H.E.W.). The ABV Defendants knew or should have known they were facilitating sex trafficking at the Austin ABV, including the trafficking of Jane Doe (H.E.W.).

### A.  The ABV Defendants' Knowledge of Sex Trafficking

103.    The ABV Defendants have known, since well before Jane Doe (H.E.W.)'s trafficking, that there was widespread sex trafficking at the Americas Best Value Inn.

> 1) *Trafficking Has Long Been Prevalent at ABV Properties, and the ABV Defendants have known it*

104.    The use of America's Best Inn properties for sex trafficking is well known to the ABV Defendants. Information that has become public through news stories and online reviews establishes the entrenched and pervasive nature of ABV Defendants' role in providing a venue where sex trafficking has continued unabated for years.

105.    Despite the mounting evidence that sex trafficking at their properties was ongoing and growing, the ABV Defendants continued to earn revenue through conduct that they knew or should have known would continue to facilitate that trafficking.

106.    Sex trafficking was prevalent at Vantage and Red Lion branded properties, including ABV properties, both on a national scale and specifically in the State of Texas.

107.    Public information, including online reviews, confirms both the widespread sex trafficking problem at the Americas Best Value Inn and the ABV Defendants' knowledge of this sex trafficking. Upon information and belief, the ABV Defendants monitored online reviews for indicia of criminal activity, including sex trafficking.

2)    *The ABV Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Austin ABV*

108.    The ABV Defendants also knew or should have known that sex trafficking was widespread and ongoing at the Austin ABV specifically.

109.    Traffickers, including the trafficker of Jane Doe (H.E.W.), repeatedly returned to the Americas Best Value Inn because the hotel provided a favorable environment for trafficking due to policies and procedures adopted and implemented by the ABV Defendants and because the hotel staff turned a blind eye to obvious signs of trafficking.

110.    There were obvious and apparent signs of this widespread trafficking activity, consistent with the well-known "red flags" of sex trafficking in the hospitality industry, that the

ABV Defendants knew or should have known about.

111.    The ABV Defendants, acting individually and jointly, directly participated in operation of the Americas Best Value Inn and, therefore, directly monitored and supervised activity at the hotel.

112.    The ABV Defendants are all affiliated entities subject to common control and that jointly operated the Americas Best Value Inn and shared revenue and profit from operation of the hotel.

113.    All knowledge from the hotel staff at is imputed to the ABV Defendants who jointly employ and/or control the hotel staff. The Americas Best Defendants knew about this widespread and ongoing trafficking at the Austin ABV, including the trafficking of Jane Doe (H.E.W.), through the direct observations of hotel staff, including management-level staff, and information otherwise relayed to this staff by other staff members, guests, and other sources.

> 3) *The ABV Defendants knew Jane Doe (H.E.W.) was being trafficked because of the apparent and obvious "red flags" of sex trafficking*

114.    During the period that Jane Doe (H.E.W.) was trafficked at the Austin ABV, there were obvious signs, observed by hotel staff, that her trafficker was engaged in sex trafficking:

a. The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards.
b. The "Do Not Disturb" door hanger was used very frequently.
c. Housekeeping staff was often prevented from entering the room for regular cleaning, towel exchange and other standard room services.
d. There was heavy foot traffic in and out of Jane Doe (H.E.W.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.
e. Jane Doe (H.E.W.) had several johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.
f. When housekeeping was allowed in and after Jane Doe (H.E.W.) checked out, hotel cleaning staff would have noticed sex paraphernalia like condom wrappers and lubricant, as well as drug paraphernalia.
g. Other girls were being trafficked at the same hotel at the same time as H.E.W. by her trafficker and other traffickers.
h. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

115. Based upon information and belief, multiple employees at the Austin ABV, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

116. Based on this and on the other methods, listed above, that they used to monitor and supervise the Americas Best Value Inn, the ABV Defendants knew or were willfully blind to the fact that Jane Doe (H.E.W.) was being trafficked at the Americas Best Value Inn.

117. Given these obvious signs, the ABV Defendants knew or should have known about the trafficking of Jane Doe (H.E.W.) based on their policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

118. The ABV Defendants also knew or should have known about Jane Doe (H.E.W.)'s trafficking based on the other methods, listed above, that they used to monitor and supervise the Americas Best Value Inn.

**B. The ABV Defendants facilitated sex trafficking, including the trafficking of Jane Doe (H.E.W.)**

119. The ABV Defendants facilitated widespread sex trafficking at the Americas Best Value Inn, including the trafficking of Jane Doe (H.E.W.).

*1) The ABV Franchisee Defendant facilitated sex trafficking at the Austin ABV*

120. The ABV Franchisee Defendant were responsible for the acts, omissions, and knowledge of all employees of the Americas Best Value Inn when operating the hotel because these acts and omissions were committed in the scope and course of employment, because they ratified these acts and omissions, and because they failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to them, of sex trafficking occurring at this hotel.

121.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Americas Best Value Inn, the ABV Franchisee Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

122.    ABV Franchisee Defendant knew or were willfully blind to the fact that Jane Doe (H.E.W.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing a venue and tools, in the form of hotel rooms and related services, to facilitate Jane Doe (H.E.W.)'s sexual exploitation.

123.    The ABV Franchisee Defendant also facilitated widespread trafficking at the Americas Best Value Inn, including the trafficking of Jane Doe (H.E.W.), in ways including:

   a.  Allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to on-premises crime and specifically human trafficking.

   b.  Continuing to provide wi-fi services to traffickers even though it knew or should have known those services were being used for advertising victims for sexual exploitation.

   c.  Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

124.    Through these actions, the ABV Franchisee Defendants formed an implicit agreement with traffickers and encouraged them to return to the Austin ABV to exploit victims including Jane Doe (H.E.W.).

### 2)  The ABV Brand Defendants facilitated sex trafficking at the Austin ABV

125.    The ABV Brand Defendants directly participated in and retained day-to-day control over renting rooms at the Austin ABV, including by:

   a.  The ABV Brand Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the

means and methods used for each of these processes.

b.  The ABV Brand Defendants directly made reservations for rooms at the Austin ABV and accepted payment for those rooms through a central reservation system that they controlled and operated. The ABV Brand Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement.

c.  The ABV Brand Defendants controlled room rates, required discounts, mandatory fees, and rewards programs.

d.  The ABV Brand Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation.

e.  The ABV Brand Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures.

f.  The ABV Brand Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Austin ABV.

g.  The ABV Brand Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Austin ABV until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

h.  The ABV Brand Defendants required franchisee to use a property management system, which was owned, maintained, controlled, and operated by the ABV Brand Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

126.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Austin ABV, the ABV Brand Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

127.    The ABV Brand Defendants directly participated in and retained control over aspects of the operation of Austin ABV related to trafficking.

128.    The ABV Brand Defendants knew or should have known that Jane Doe (H.E.W.) and other victims were being trafficked and, despite this, benefited from continued association

with criminal traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate sexual exploitation of victims, including Jane Doe (H.E.W.).

129.    Upon information and belief, the ABV Brand Defendants participated directly in aspects of the operation of the Austin ABV that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to:

a.  The ABV Brand Defendants publicly assumed responsibility and control over the human trafficking response of all America's Best Inns properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy.

b.  The ABV Brand Defendants retained control over when branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in branded hotels.

c.  The ABV Brand Defendants retained control, at the brand-wide level, over security training, including how to detect and respond to criminal activity, including trafficking.

d.  The ABV Brand Defendants were responsible for adopting, enforcing, and monitoring policies and codes of conduct related to criminal activity, including human trafficking, at the Austin ABV.

e.  The ABV Brand Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Austin ABV, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

130.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Austin ABV, the ABV Brand Defendants continued operating Austin ABV together with Amin in a way that it knew or should have known would result in facilitating additional sex trafficking at Austin ABV, including by:

a.  adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

b.  adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

c.  adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d.  adopting and enforcing policies and protocol regarding trafficking in a way that let to widespread and ongoing trafficking at the hotel property;

e.  providing traffickers continued access to Franchisor-maintained internet systems despite having or constructive knowledge this access was being used for advertising services related to their trafficking activities;

f.  adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at Austin ABV;

g.  implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

131.  If the ABV Brand Defendants had exercised reasonable diligence when operating Austin ABV and, the ABV Brand Defendants would have prevented the Austin ABV from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.). Instead, the ABV Brand Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.).

**C.  The ABV Defendants' ventures at the Austin ABV**

132.  Through the conduct described above, the ABV Brand Defendants and Amin knowingly benefited from engaging in a venture with sex traffickers at Austin ABV, including Jane Doe (H.E.W.)'s traffickers, as follows:

a.  The ABV Brand Defendants and Amin both received benefits, including increased revenue, every time a room was rented at Austin ABV.

b.  This venture engaged in violations of violated 18 U.S.C. §1591 through the actions

of the criminal traffickers at Austin ABV, which the ABV Brand Defendants and Amin knew or should have known about.

c.  The ABV Brand Defendants and Amin associated with traffickers, including Jane Doe (H.E.W.)'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

d.  The ABV Brand Defendants and Amin had a mutually beneficial relationship with the traffickers at Austin ABV, fueled by sexual exploitation of victims.

e.  Sex traffickers, including Jane Doe (H.E.W.)'s traffickers, frequently used Austin ABV for their trafficking because of an implicit understanding that Austin ABV was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of the ABV Brand Defendants and Amin facilitating that trafficking as described throughout this complaint. This resulted in benefits, including increased revenue, for the ABV Brand Defendants and Amin.

f.  Both the ABV Brand Defendants and Amin participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g.  Jane Doe (H.E.W.)'s trafficking at Austin ABV was a result of the ABV Brand Defendants and Amin's participation in a venture with criminal traffickers. If the ABV Brand Defendants and Amin had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (H.E.W.)'s trafficking at Austin ABV.

133.  Through the conduct described above, the ABV Brand Defendants also knowingly benefited from engaging in a venture with Amin operating Austin ABV as follows:

a.  The ABV Brand Defendants and Amin acted together to operate Austin ABV.

b.  Pursuant to the terms of the franchising agreement, both The ABV Brand Defendants and Amin received financial benefits from Austin ABV, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

c.  This venture violated 18 U.S.C. §1591(a) through the conduct of Amin and the widespread sex trafficking at Austin ABV.

d.  Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §1591(a), The ABV Brand Defendants participated in the venture by continuing to associate with Amin to operate Austin ABV in a way that

it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe H.E.W.

e.  Jane Doe H.E.W.'s trafficking at Austin ABV was a result of The ABV Brand Defendants' and Amin's facilitation of the widespread and ongoing violations of 18 U.S.C. §1591(a) at Austin ABV. Had The ABV Brand Defendants not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §1591(a), it would not have received a benefit from Jane Doe H.E.W.'s trafficking at Austin ABV.

**D.  Amin and the staff at the Austin ABV acted as actual agents of the ABV Brand Defendants.**

134.  The ABV Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Amin and the staff at Austin ABV, which are the ABV Brand Defendants' actual agents or subagents.

135.  The ABV Brand Defendants exercised pervasive and systematic control of Defendant Amin regarding the operation of the subject Austin ABV.

136.  At all relevant times, Defendant Amin acted as the agent of the ABV Brand Defendants when operating the Austin ABV.

137.  At all relevant times, Amin was subject to and required to comply with franchise agreement standards, policies, and rules adopted by the ABV Brand Defendants. These standards and policies are detailed and control the specific manner and means by which Defendant Amin must operate the subject Austin ABV.

138.  The ABV Brand Defendants require franchisees, such as Amin, to allow the ABV Brand Defendants to regularly inspect its Austin ABV branded hotels.

139.  The ABV Brand Defendants regularly inspected Austin ABV.

140.  The ABV Brand Defendants subjected Amin to detailed standards and requirements regarding the operation of Austin ABV through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives,

mandates, and expectations imposed by The ABV Brand Defendants. These written standards, protocols, and requirements:

    a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Amin used at Austin ABV; and

    b.  covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

    c.  dictated the specific manner in which Amin and hotel staff must carry out most day-to-day functions at Austin ABV; and

    d.  significantly exceeded what was necessary for the ABV Brand Defendants to protect registered trademarks.

141.    The ABV Brand Defendants specifically retained control of the day-to-day operation of Defendant Amin with regard to aspects of operation of the subject Austin ABV that caused (H.E.W.)'s harm, including but not limited to reservation policies and procedures, staff training, security policies, and training, education policies, and procedure regarding human trafficking.

142.    The ABV Brand Defendants regularly advised Amin on operational changes necessary for it to remain in compliance with the ABV Brand Defendants' strict regulations.

143.    The ABV Brand Defendants had the ability to impose fees or fines on Amin. Furthermore, at all material times, the ABV Brand Defendants retained an absolute right to cancel the franchise agreement with Amin if the ABV Brand Defendants' rules were violated or if Amin otherwise failed to comply with its contractual obligations.

144.    The ABV Brand Defendants and Defendant Amin shared control of the terms and conditions of the employment of staff at the subject Austin ABV and, therefore, Defendant the ABV Brand Defendants and Defendant Amin are joint employers. Upon information and belief, the ABV Brand Defendants exercised control over the terms and conditions employment of staff at the subject Austin ABV by advertising employment opportunities, making or influencing

employment decisions, setting employee wages, and adopting standardized rules of operations that

govern the day-to-day work of the employees.

    145.    In addition to the ways described above, upon information and belief, the ABV

Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over

Amin's day-to-day operation of the Austin ABV, including the following ways:

    a.  requiring the franchisee and hotel staff to keep detailed records of the day-to-day operations of the hotel;

    b.  requiring the franchisee and hotel staff to submit detailed reports on aspects of day-to-day operations;

    c.  requiring the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis;

    d.  exercising or retaining control over vendors that franchisees can use to procure supplies for day-to-day operations;

    e.  dictating the specific tools that franchisee and hotel staff must use to perform day-to-day operations of the hotel;

    f.  requiring franchisees to use specific complaint resolution programs;

    g.  dictating the response of franchisees to specific complaints;

    h.  exercising or retaining control over the franchisee's day-to-day accounting and banking practices;

    i.  requiring franchisees to participate in mandatory marketing and advertising programs;

    j.  exercising sole control over a website for the hotel property and prohibiting franchisee from using any other website for the hotel property;

    k.  restricting the franchisee's ability to contract out the work of operating the hotel and retaining control over the franchisee's ability to use a management company or other third-party contractor;

    l.  exercising or retaining control over all aspects of building and facility design;

    m.  reserving the right to order upgrades and improvements to facilities and operations at the hotel;

n.  retaining control over all in-room services, including whether and under what conditions adult movie should be offered;

o.  retaining the right to use meeting rooms and other space at the hotel property to conduct meetings and other business;

p.  publicly labeling hotel employees as "our staff" or "our hotel staff";

q.  exercising or retaining control over human resources issues at the hotel property;

r.  posting jobs for its branded properties;

s.  providing benefits to staff of its branded properties;

t.  setting parameters and guidelines for mandatory evaluations of hotel staff;

u.  setting pay, pay parameters, or pay ranges for hotel staff;

v.  setting job qualifications for hotel staff;

w.  setting job descriptions for hotel staff;

x.  adopting policies that specifically dictate which positions must perform which day-to-day functions;

y.  dictating staffing levels required at hotels;

z.  making or influencing hiring decisions for hotel staff;

aa. providing or controlling onboarding for hotel staff;

bb. exercising or retaining control over standardized training for hotel employees and management;

cc. controlling the time, manner, and location of training for franchisees and hotel staff;

dd. requiring all management personnel to attend franchisor led training;

ee. exercising or retaining control over training for front desk, housekeeping and operational staff;

ff. retaining sole discretion to determine whether franchisee and hotel staff have satisfactorily completed training;

gg. adopting policies that dictate specific disciplinary steps for specific infractions by

hotel staff;

hh. maintaining employment records, including training records, for hotel staff

ii. establishing employee recognition programs for hotel staff;

jj. requiring that franchisee maintain specific levels of insurance and list the franchisor as an additional insured;

kk. retaining sole discretion to transfer the franchising agreement to any person or entity without notice but prohibiting franchisee from transferring the agreement without the franchisor's consent.

146.    Upon information and belief, the ABV Brand Defendants had the right to and did enforce its control over Amin through various methods, including:

a. the right to conduct detailed inspections of the Austin ABV;

b. monitoring or auditing the Amin for compliance with policies and expectations;

c. directing Amin to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d. mandating training and education for franchisees and/or hotel staff;

e. employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f. the right to impose fines or penalties;

g. the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services;

h. the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

**E.  Relationships among the ABV Brand Defendants.**

147.    Red Lion is responsible, as a successor, for the acts and omissions of its predecessors, including VHGI, Inc. and Vantage Franchising Inc., with respect to operation, franchising, and control of the Austin ABV.

148.    Upon information and belief, in 2016, Red Lion acquired the brands and brand

operations of VHGI, Inc. and its subsidiaries. This included all or substantially all of VHGI, Inc.'s operating assets, including the America's Best Value brand, which Red Lion continued to operate at locations around the United States, including in Texas. Upon information and belief, Red Lion agreed to assume responsibility for liabilities of VHGI, Inc., its predecessors, and its former subsidiaries regarding the franchising, control, and operation of the Austin ABV.

149.    Upon information and belief, Red Lion agreed to assume responsibility for liabilities of VHGI, Inc., its predecessors, and its former subsidiaries regarding the franchising, control, and operation of the Austin ABV.

150.    Upon information and belief, the rights, and obligations with respect to the operation, franchising, and control of the Austin ABV were shared and fulfilled jointly by the ABV Brand Defendants. Upon information and belief, each of the ABV Brand Defendants shared revenue related to operation, franchising, and control of the Austin ABV and each of the ABV Brand Defendants experienced a direct benefit from the rental of rooms to traffickers at the Austin ABV. Upon information and belief, each of the ABV Brand Defendants participated directly in the ventures franchising, controlling, operating, and renting rooms at the Austin ABV in the ways outlined more specifically above. Further, upon information and belief, each of the ABV Brand Defendants knew or should have known that these ventures were engaged in facilitation of sex trafficking.

151.    Upon information and belief, each of the ABV Brand Defendants participated in a joint venture regarding the operation, control, and franchising of the Austin ABV. The ABV Brand Defendants, who were corporate affiliates subject to common ownership and control, were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations

of the other participants in the joint venture with respect to the operation, franchising, and control of the Austin ABV.

## V.    The TVPRA violations at the Wyndham Properties.

152.    In 2013 and 2014, Jane Doe (H.E.W.) was repeatedly trafficked at the Austin Baymont, Austin Days Inn, Airport Super 8, and University Super 8 (collectively "Wyndham Properties"). The Wyndham Franchisee Defendants and the Wyndham Brand Defendants (collectively "Wyndham Defendants") benefited from the rental of the rooms that were used to sexually exploit victims, including Jane Doe (H.E.W.). The Wyndham Defendants knew or should have known they were facilitating sex trafficking at the Wyndham Properties, including the trafficking of Jane Doe (H.E.W.).

### A.  The Wyndham Defendants' knowledge of sex trafficking

153.    Wyndham Defendants' actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Wyndham Defendants has known, since well before Jane Doe (H.E.W.)'s trafficking, that sex trafficking was ongoing and widespread at Wyndham branded properties including the subject properties.

154.    Unfortunately for Jane Doe (H.E.W.), the promises made by the Wyndham Defendants have proven empty. Wyndham Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (H.E.W.).

> 1)  *Sex Trafficking has long been prevalent at Wyndham Properties, and the Wyndham Defendants have known it*

155.    Upon information and belief, at all relevant times Wyndham has adopted a

centralized approach to trafficking-related issues at all its branded properties. Wyndham's public statements confirm that it knew sex trafficking was a problem at its hotels and that it retained control over the response of its branded hotels to sex trafficking. Wyndham has recognized it has a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[18] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[19] However, Wyndham has refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[20]

156.    Unfortunately, while Wyndham's statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[21]

157.    The problem of sex trafficking at Wyndham properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotel staff from supporting child sex trafficking.[22] Although Wyndham publicly committed to take steps to stop facilitating trafficking, this promise proved empty; Wyndham has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[23]

---

[18] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[19] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[20] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023
[21] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")
[22] https://www.change.org/p/stop-wyndham-hotel-staff-from-supporting-child-sex-trafficking-in-wyndham-hotels
[23] https://endsexualexploitation.org/wyndham/

158.    Sex trafficking was prominent at Wyndham branded properties, including Baymont, Days Inn and Super 8 properties. Public information, including scores of news stories and online reviews, confirms both the widespread sex trafficking problem at Wyndham branded hotels and Defendants' knowledge and understanding of the problem.

159.    In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[24]

160.    Examples of notable press involving the frequent use of Wyndham branded hotels for illegal activity, including sex trafficking at Days Inn locations across the country include:

- In July 2010, a man was arrested at a Days Inn in Metairie, LA on human trafficking charges and was accused of forcing North Carolina teens into prostitution.[25]

- In June 2011, a woman was sentenced to 9 years in prison for the sex trafficking of two 14-year-old girls. The girls were forced to work at the Days Inn in Hartford, Connecticut.[26]

- In February 2012, a man was arrested by FBI agents and members of the Human Trafficking Task Force on charges of sex trafficking of children for pimping out a 14-year-old girl who was rescued from a Days Inn in Florida.[27]

- In 2012, the first successful prosecution of a human trafficking case in Wisconsin occurred after a man trafficking a woman at a Days Inn in Wausau, Wisconsin.[28]

- Three people were arrested in July 2014 in Fayetteville on human trafficking charges after holding a woman captive at a Days Inn.[29]

---

[24] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

[25] Michelle Hunter, *Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution*, The Times-Picayune (July 20, 2010), https://www.nola.com/news/crime_police/man-arrested-in-metairie-on-human-trafficking-charges-accused-of-forcing-north-carolina-teens-into/article_c113df92-9046-56a1-bc02-7c065f5a9435.html.

[26] *East Hartford Woman Sentenced to 9 Years In Prison for Sex Trafficking Of Two 14-Year-Old Girls*, Hartford Courant (June 24, 2011), https://www.courant.com/2011/06/24/east-hartford-woman-sentenced-to-9-years-in-prison-for-sex-trafficking-of-two-14-year-old-girls/.

[27] Alexandra Seltzer, Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14, The Palm Beach Post (Feb. 7, 2012), https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/.

[28] Shereen Siewert, *Sex-trafficking cases hard to crack in Wisconsin*, Post Crescent (March 25, 2014), https://www.postcrescent.com/story/news/2014/03/25/sex-trafficking-cases-hard-to-crack-in-wisconsin/6884671/.

[29] Three arrested on human trafficking charges in NC, Fox8 (July 2, 2014), https://myfox8.com/news/three-arrested-on-human-trafficking-charges-in-nc/.

- In July 2014, three people were arrested and accused of kidnapping and torturing a woman for human trafficking out of a Days Inn in Orange County, CA.[30]

- In September 2014, two Nevada residents were arrested on sex trafficking charges. Officers set up surveillance at a Days Inn in Nashville and "it did not take long for officers to observe heavy foot traffic in and out of that hotel room consistent with a prostitution operation."[31]

- In April 2015, a Philadelphia man was sentenced for sex trafficking minors. The man worked as a security guard at a Days Inn in Philadelphia and "provided protection and assistance to sex traffickers operating at the motel in exchange for a daily fee."[32]

- In June 2015, two Brooklyn men charged with sex trafficking allegedly forced a teenage girl into prostitution from a Long Island City Days Inn.[33]

- In July 2015, after investigating possible prostitution at a Days Inn in Maryland, Frederick County sheriff's deputies charged a Hagerstown man with human trafficking after two teenage girls were forced into prostitution.[34]

- In March 2016, a 22 year-old Sandy Springs man was arrested in Athens, Ga., and charged with pimping a person under 18 and sex trafficking after holding a 16-year-old against her will at a Days Inn in Athens and forcing her to engage in sex in exchange for money.[35]

161.    And for Super 8:

- In 2010, a California man was arrested for trafficking a 16-year-old victim after being spotted by law enforcement with the minor at a Super 8 in California.[36]

---

[30] Jeanne Kuang, Three Accused of Kidnapping, Torturing Woman for Human Trafficking in Orange County, NBC Los Angeles (July 30, 2014), https://www.nbclosangeles.com/news/three-accused-of-brutally-kidnapping-torturing-woman-for-human-trafficking-in-orange-county/65718/.

[31] Las Vegas Man, Woman Jailed on Prostitution Charges, City of Franklin, TN (Sept. 5, 2014), https://www.franklintn.gov/Home/Components/News/News/2563/.

[32] Philadelphia Man Sentenced for Sex Trafficking Conspiracy, U.S. Attorney's Office (April 9, 2015), https://www.fbi.gov/contact-us/field-offices/philadelphia/news/press-releases/philadelphia-man-sentenced-for-sex-trafficking-conspiracy.

[33] Jackie Strawbridge, Cuffed Brooklyn Men Allegedly Pimped At LIC Hotel, licpost (June 9, 2015), https://licpost.com/cuffed-brooklyn-men-allegedly-pimped-at-lic-hotel.

[34] Jeremy Arias, Hagerstown man charged with trafficking of two teenage girls, The Frederick News-Post (July 1, 2015), https://www.heraldmailmedia.com/story/news/local/2015/07/01/hagerstown-man-charged-with-trafficking-of-two-teenage-girls/45202521/.

[35] Dyana Bagby, Sandy Springs man arrested in Athens, Ga., for sex trafficking, RoughDraft atlanta (March 24, 2016), https://roughdraftatlanta.com/2016/03/24/sandy-springs-man-arrested-athens-ga-sex-trafficking/.

[36] https://www.wired.com/2010/11/epps/

- In November 2011, a man was sentenced for sex trafficking after he forced minor girls to engage in commercial sex for his financial benefit, including at a Super 8 Motel in Virginia.[37]

- In January 2011, a man was sentenced to life for child sex trafficking for requiring a minor to perform commercial sex services more than 50 times over a 14-day period at a Florida Super 8 Motel.[38]

- In June 2011, an MS-13 gang member was indicted for trafficking girls at a Super 8 Motel near Washington, D.C.[39]

- In 2012, four were indicted after forcing a 24-year-old woman to engage in commercial sex at Ohio hotels, including a Super 8.[40] In December 2012, a man was arrested for attempting to entice a 15-year-old girl to engage in prostitution at a Super 8 Motel in Oklahoma.[41]

- In April 2013, two were arrested for trafficking a juvenile girl at an Illinois Super 8.[42]

- In June 2013, a man was arrested on human trafficking charges after he forced a woman to engage in commercial sex at hotels, including a Louisiana Super 8 Motel.[43]

- A man was sentenced to 21 years in prison for sex trafficking his 16-year-old girlfriend starting in August 2013 at two hotels in Dallas, including a Super 8 Motel.[44]

- In 2013, a man was arrested at a Super 8 in Rhode Island and charged with trafficking a 17-year-old girl at the motel.[45]

---

[37] Gang member sentenced for sex trafficking in Prince William, News & Messenger (Manassas, Virginia) (November 4, 2011) https://plus.lexis.com/api/permalink/562d85d9-e662-4e4f-8f7f-67b52fa537e8/?context=1530671

[38] https://www.fbi.gov/jacksonville/press-releases/2011/ja011011.htm

[39] https://www.thepublicdiscourse.com/2011/10/4034/

[40] https://www.10tv.com/article/news/crime/crime-tracker/four-indicted-first-human-trafficking-case-franklin-county/530-36f713e6-5488-4465-90c0-7eb99504a635

[41] Man faces new sex-trafficking charges, Tulsa World (Oklahoma ) (March 9, 2013) https://plus.lexis.com/api/permalink/a9062a1a-76b4-4811-89ab-5b0b3c877a88/?context=1530671

[42] https://www.channel3000.com/news/local-news/2-women-accused-of-human-trafficking-at-motel/article_98edf1d4-d231-5ea1-a6b9-e71c83f44750.html

[43] https://www.endslaverytn.org/news/tenn-man-booked-in-human-trafficking-newsarticle

[44] https://www.ice.gov/news/releases/dallas-gang-member-sentenced-21-years-federal-prison-child-sex-trafficking-conviction

[45] https://turnto10.com/archive/new-details-in-ardrey-sex-trafficing-investigation

- In September 2013, a Super 8 motel in Massachusetts was searched and a man was charged with sex trafficking of a 17-year-old developmentally disabled girl after staying with her at that hotel.[46]

- In November 2013, two pled guilty to sex trafficking charges after forcing a child to engage in commercial sex at Super 8 Motel in Texas.[47]

- In June 2014, two were charged with trafficking a 13-year-old girl at a Minnesota Super 8.[48]

162.    Ultimately, several hundred of traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of Wyndham branded properties.

163.    Similarly, Defendants knew sex trafficking was occurring at their hotels through publicly available online review websites, which are regularly reviewed by companies such as Defendants. For example, for Days Inn:

- A June 2007 Tripadvisor review from a Days Inn in Fresno, CA states "…Which leads me to note the problems with this motel--its location. Because it's close to the 99, and gets a lot of quick travelers up and down the highway, it seems to be the neighborhood to find a prostitute. During our one day stay, we saw at least 4. In the DAYTIME!! And although we weren't bothered by anyone, and the motel itself was quiet, if you've got a family you may want to skip this one."[49]

- A July 2007 Tripadvisor review from a Days Inn in Philadelphia, PA states "This was the worst place I've ever stayed in my life. I've stayed in a lot of Day's Inn that were clean, adequate rooms in a safe neighborhood. As we followed the directions we became apprehensive. When we entered the hotel lobby we knew we had made a mistake when we saw the "bullet proof glass"surrounding the front desk. With our arrival being 4th of July week we felt stuck knowing we could probably not find another room in town at 7 PM. We decided it was better to lock ourselves in a room there than to risk not finding a room elsewhere and having to spend the night in the car. I'll just say that after my one night stay here I'm not sure if I'll ever book Days Inn again! The carpet was soiled. The headboards that were supposed to be bolted to the wall was coming off. We checked out at first light assuming this would be the safest time of day to get out! Prostitutes were hanging around out front and

---

[46] https://www.providencejournal.com/story/news/crime/2013/09/14/20130914-missouri-man-charged-with-sex-trafficking-in-mass-teens-disappearance-ece/35397014007/

[47] https://www.chron.com/news/article/two-plead-guilty-to-child-sex-trafficking-5000132.php

[48] https://www.grandforksherald.com/newsmd/moorhead-police-charge-two-with-sex-trafficking-13-year-old

[49] https://www.tripadvisor.com/Hotel_Review-g32414-d77021-Reviews-Days_Inn_by_Wyndham_Fresno_Central-Fresno_California.html

coming in purchasing rooms. Definately not a place for a family!"[50]

- August 2008 Tripadvisor review from a Days Inn in Birmingham, AL states "Saw the website pictures and thought it looked nice and was a good value. So, I booked the room for a week. It was a mistake! It was dirty and had a lot of low life people staying there. Prostitutes, pot heads, and people wandering around all over the place. The pool was a "cess-pool". It stank, and there was a condom wrapper in it. I will NEVER stay there again"[51]

- November 2008 Expedia review from a Days Inn in Nanuet, NY states "The one thing that I will always remember about this hotel was that I had to call the front desk because a very loud and noisey pair of hookers decided to hang out in the hallway next to the exit door (which was unfortunately right near my room) while they waited for a ride to pick them up after their visit to the neighboring hotel room. They were loud and obnoxious after 10 pm while I and my family were trying to sleep. We were on a non-smoking floor and the hookers in the hallway were smoking. When we checked out the next morning we found the hallway littered with their half-eaten pizza slices and crumpled up paper cups. I had to call the front desk to complain about the noise. I don't know if it was a hotel employee or their ride who finally showed up and hustled the call-girls out of the hallway."[52]

- December 2008 Tripadvisor review of a Days Inn in Silver Spring, MD states "This was the worst hotel in my life!" "Both me an my friend are not weedy guys, but we felt unsafe staying there. At around 6pm some black guys kept hovering outside the room, then as it got later some other black guys pulled up in a car outside in the car park and where making lots of noise in there car... then other black guys would go up to the car, and then after a while walk off. Seemed like drug deals where going on in the car park! This is bad because the hotel has absolutely no (ZERO!) security. Members of the public can freely walk in and just go straight to the rooms. It felt very unsafe, so we instantly checked out and made a quick getaway! Later we found a motel 6 which was a little better but at least safer than this hotel. Other people from the area told us that if the locals notice any foreigners then we could be easy targets and they will watch us. Very unsafe. bullet proof glass in the reception, its basically like being in the bronx run down hotel. It seems that its a very cheap hotel, where the criminals, drug dealers, prostitutes use as its cheap. Dangerous for outsiders or foreigners to use. Not recommended at all. Avoid at all costs."[53]

- February 2009 Tripadvisor review of a Days Inn in Miami, FL states "…got to the hotel, which is in a seedy neighborhood. Walked into the lobby and there were six

[50] https://www.tripadvisor.com/Hotel_Review-g60795-d96684-Reviews-or20-Days_Inn_by_Wyndham_Philadelphia_Roosevelt_Boulevard-Philadelphia_Pennsylvania.html
[51] https://www.tripadvisor.com/Hotel_Review-g30375-d73343-Reviews-Days_Inn_by_Wyndham_Birmingham_West-Birmingham_Alabama.html
[52] https://www.expedia.com/Nyack-Hotels-Days-Inn-By-Wyndham-Nanuet-Spring-Valley.h172075.Hotel-Reviews
[53] https://www.tripadvisor.co.za/Hotel_Review-g41378-d84007-Reviews-or260-Days_Inn_by_Wyndham_Silver_Spring-Silver_Spring_Montgomery_County_Maryland.html

people in front of us trying to check in. There was a HOOKER working in the lobby. There was one person working plus a security guard. It was taking the receptionist 15 minutes to check in one person. We realized it would be an hour and a half to check in, we'd only get to sleep for 2.5 hours, so we got BACK in the shuttle and slept on the floor of the airport, it was that scary. Don't be fooled."[54]

- July 2010 Tripadvisor review of a Days Inn in Springfield, MO states "Hotel Staff was very friendly, but when we first went into the room there was trash under the bedskirt and a used condom laying by the night stand…Worst of all there were prostitutes staying down below us, I had to go notify staff, she comented that she wonder if that was why she was staying here and the day before we came back to the hotel from watching my son play ball and 2 women were being arrested on the stairs going up to our room. There were several homeless people hanging around the hotel for 3 of the days. I have stayed in Days Inn before and they were nice but I did not feel safe and the experience was bad so I am not sure I will stay again…"[55]

- August 2010 review from Days Inn in Norfolk, VA states "…There were many people drinking on the upper floor. We were told by a passerby that their son was offered services by prostitutes while on the premises. We left right away. Front desk staff said this hotel is safe but front desk staff will note even allow people to walk into the front desk lobby but rather communicate with people through a little hole on a confined space area about 4 x 7 room prior to entering the front desk lobby giving people a false sense of security. There were many people drinking on the upper floor and loitering. No security staff to enforce any rules. My family was frightened to stay at this inn."[56] The manager of this hotel responded to it on November 19, 2010.

- September 2010 review of a Days Inn in Milwaukee, WI states "…got back about midnight to find a pair of gentlemen bleeding in the main lobby, i later found out that they were there for a bachelor party and had found a couple "working girls" who took them out and then drugged and beat them, and the their pimp did some stuff i dont even want to repeat, regardless to say, i didnt spend the night, i left at about 3 am, checked into a hotel and absolutely would not recomment this hotel, staff and hotel are nice enough. but the manager and location are just not worth dealing with."[57]

- June 2011 Expedia review of a Days Inn in San Jose, CA states "NOT SAFE PLACE TO STAY OR BRING YOUR FAMILY. Nothing was clean, swimming pool was not usable, there were blood stains on the sheets, no customer

---

[54] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-
Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html
[55] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-
Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html
[56] https://www.tripadvisor.com/Hotel_Review-g58026-d110777-Reviews-
Days_Inn_by_Wyndham_Norfolk_Military_Circle-Norfolk_Virginia.html
[57] https://www.tripadvisor.com/Hotel_Review-g60097-d1571552-Reviews-
Days_Inn_Suites_by_Wyndham_Milwaukee-Milwaukee_Wisconsin.html

service.~~Worst of all, there were drug deals there all the time as well I was propositioned for sex as someone thought I "worked there" Please do not stay here if you want to feel safe"[58]

- January 2012 review from a Days Inn in Lawndale, CA states "… it felt super unsafe lie kinda place that hookers, pimps, gens, & drug dealers frequent. … I would never stay here again. this place is a motel! worth only about $25 a night. its no good unless u just need four walls and bed to sleep in for a night."[59]

- March 2012 review from a Days Inn in New Stanton, PA states "…Sketchy men are inside their truck smoking and hanging out in the parking lot. Men start ogling me and eying me in a creepy, sketchy way and my coach and her husband (both are cops) make a comment about a young woman who is scantly clad and walking with a man in his sixties arm in arm. The son makes a comment that a business transaction was going on and this was a prostitute and a john!" "So, I know that they got rid of my room, because they would rather charge a desperate pervert a higher rate so that he could pay for sex, then an athlete with a lower rate. I argue with the two people at the front desk and get into a shouting match and then five sketchy men stand right near the front desk staring there even after he said that the hotel was booked full…"[60]

- June 2012 review from Das Inn in Atlantic City, NJ states "…when I came back to my hotel I was greeted by to atlantic city prostitutes walking out of the lobby with the european looking fellow. At the lobby the hotel has a $10 per guest policy I suppose as a way of making commissions. Lol. Uuuugh.for the price I paid I should have expected as much and not been as naive but I won't be making that mistake again."[61]

- October 2012 Yelp review of a Days Inn in Sarasota, FL states "Great hotel - if you enjoy being propositioned by prostitutes. Skid row's "finest." A real DUMP."[62]

- January 2013 review from Days Inn in Copiague, NY states "I would not wish this place on my worst enemy. The room smelled like a dead body and they tried to cover it up with Lysol. I let them know that I tried to air the room out for 20 minutes and it did not help. They moved me to the room next door and it was the same thing. There were all kinds of ghetto trash hanging around my car when I was leaving and the place seemed like a party/hooker hotel based on the people hanging around there."[63]

---

[58] https://www.expedia.com/San-Jose-Hotels-Days-Inn-By-Wyndham-San-Jose.h18108.Hotel-Reviews
[59] https://www.tripadvisor.ca/Hotel_Review-g32612-d84227-Reviews-Days_Inn_by_Wyndham_Los_Angeles_Lax_Redondo_ManhattanBeach-Lawndale_California.html
[60] https://www.yelp.com/biz/days-inn-by-wyndham-new-stanton-pa-new-stanton
[61] https://www.yelp.com/biz/days-inn-by-wyndham-atlantic-city-oceanfront-boardwalk-atlantic-city
[62] https://www.yelp.com/biz/days-inn-by-wyndham-sarasota-bay-sarasota
[63] https://www.tripadvisor.ca/Hotel_Review-g47533-d1176402-Reviews-Days_Inn_by_Wyndham_Long_Island_Copiague-Copiague_Long_Island_New_York.html

- January 2013 review of Days Inn in Miami, FL states "Our television didn't work, the walls and tub had stains all over them, and there were hookers and their pimp hanging out waiting for johns on the top floor of the outside rooms overlooking the parking lot. When we complained it was obvious that some of the staff obviously knew what was going on with the prostitution. However the staff we dealt with did try to accomodate us by giving us another room on the inside of the hotel, but it was still filthy."[64] A guest relations manager responded to this review on February 4, 2013.

- March 2013 review of a Days Inn in Monroeville, PA states "jenny calderlore (manager) u are failing at making this hotel a success ur neglect and lack of responsibility has turnd me and buisness partners off we will never use this shack again we areas more then the twobit nite people (prostitutes and drug abusers) that use ur facility i will never consider ur hotel again!"[65]

- April 2013 review of a Days Inn in Alexandria, VA states "…Everything is true about the drug activity, prostitutes, across the street is section 8 housing with loud music and lots of "traffic" to one house in particular…Safety is definitely a concern.. I parked my car one night after partying in DC and a bum knocked on my window asking for change. The police have come a few nights driving through the area asking is everything okay. One officer referred to the area as the "problem area"."[66] A guest relations manager responded to this review on April 7, 2013.

- May 2013 review of a Days Inn in Kent, WA states "…During this wait is when we witnessed the worrying stuff. We got the impression that most of the other motel guests lived there. There were guests in and out asking the desk if they had messages who either looked really disheveled or like a prostitute. Some of them knew each other. There was one woman checking in. The employee at the counter told her that if she had any "guests" she would be asked to leave..clearly there was a history. I wrote all this off to my imagination..until a police officer came in. He talked to the staff about their ongoing problems with prostitution and drugs and was offering his help and advice..the staff told him about the people living in their van and car in the parking lot. There were three police cruisers in the parking lot for awhile after that."[67]

- July 2013 review of a Days Inn in Louisville, KY states "I could not believe how bad this place was. The room was nasty, I was afraid to put my 8 month old down! The tub was stained and there were "hairs" in the tub. Not only was the room bad but so was the area..we had prostitutes working from the sidewalk outside our door!

---

[64] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html
[65]
[66] https://www.tripadvisor.co/Hotel_Review-g30226-d83887-Reviews-Days_Inn_by_Wyndham_Alexandria-Alexandria_Virginia.html
[67] https://www.tripadvisor.com/Hotel_Review-g58537-d216846-Reviews-Quality_Inn_Kent-Kent_Washington.html

We checked out and went to another hotel down the road."[68] The hotel manager responded to this review on July 12, 2013.

- July 2013 review from Days Inn in Corpus Christi, TX states "…I honestly felt that some sort of prostitution was taking place on premises. I can think of no other explanation for the constant activity between midnight and 5:00 a.m. No iron in the room. Hallways smelled like the place had been in a flood. after the first night my son's legs boke out in a rash. The worst hotel experience ive ever had. Definitely not worth $476."[69]

- September 2013 review from a Days Inn in Dallas, TX states "…The hotel is used mainly by prostitutes and drug dealers. It was a last minute decision on my part, due to a change in my work plans. At least I didn't find bed bugs... Wifi only worked in the lobby, false advertising on the hotel's part.... Employees there (front desk clerk and housekeeping) were very unfriendly and not helpful. overall, the worst experience with a hotel, ever. I'm upset that I paid for such crappy service and room."[70] A guest relations manager responded to this review on September 24, 2013.

- January 2014 review from a Days Inn in Beaumont, TX states "Let's see, moldy smell in room? Check. Mildew around tub? Check. Hastily painted over black mold on the wall? Check. Look on my wife's face when a hooker knocks on the door at 2 AM.? Priceless!"[71]

- February 2014 review from a Days Inn in Saint Paul, MN states "…However, when my companions and myself (three women total) went down to the bar for a drink we were propositioned.I had security remove this man. But within a short period of time he was back again harssing us. I did find out from a family member whom we were visitng that this hotel was busted for a prostitution ring. Well, that was not on the description of the hotel that I read! Had I known this we would have stayed elsewhere."[72]

- April 2014 review of a Days Inn in North Charleston, SC states "…We will NEVER stay here again. The first two nights the people next door argued and yelled half the night. Think a hooker and her pimp because people kept coming in and out all night, ridiculous."[73]

---

[68] https://www.tripadvisor.com/Hotel_Review-g39604-d295278-Reviews-Days_Inn_by_Wyndham_Louisville_Airport_Fair_and_Expo_Center-Louisville_Kentucky.html
[69] https://www.expedia.com/Corpus-Christi-Hotels-Days-Inn-Suites-By-Wyndham-Corpus-Christi-Central.h43249.Hotel-Reviews
[70] https://www.tripadvisor.co.nz/Hotel_Review-g55711-d109479-r368180294-Days_Inn_Suites_by_Wyndham_Dallas-Dallas_Texas.html
[71] https://www.yelp.com/biz/days-inn-by-wyndham-beaumont-beaumont
[72] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Quality-Inn-St-Paul-Minneapolis-Midway.h20646.Hotel-Reviews
[73] https://www.expedia.com/Charleston-Hotels-Days-Inn-Suites-By-Wyndham-Charleston-Airport-West.h11774.Hotel-Reviews

- May 2014 review of a Days Inn in Lanham, MD states "This hotel seems highly trafficked by young adults and/or those using said hotel rooms for sex/prostitution purposes. There was also a lot of screaming and cursing amongst the guests staying at hotel, with very little intervention from night staff."[74]

- July 2014 review of a Days Inn in Columbia, SC states "This place is a dump!! Not a safe place to stay with your family. Hooker's walking around, high speed chase, and drug dealing in front of my room!!! Do Not waste your money!!!"[75]

- July 2014 review of a Days Inn in Savannah, GA states "…Friday night I get woke up by drunk guest in the court yard. 1 am . I go to get something from the car there is 2 prostitutes offering sex for money in the drive way to a group of men getting drunk in the driveway. I decide to get stuff from the vending machines, I couldn't buy a candy bar but you could by condoms…"[76]

- September 2014 review of a Days Inn in Springfield, MO states "Worse hotel ever the room smelt like dirty feet, drug deal in the parking lot. A hooker trying to get my son to come to her room people knocking at your door all hours of the night. Then they took an $101 for charges and told me the room smelt like cigarettes.I dont smoke. So now I'm fighting with corporate office to get back my $101."[77] The hotel manager responded to this review on October 20, 2014.

164. And for Super 8:

- An August 2008 review of a Super 8 property in Arizona stated: "Woke in middle of night (2:30am) with loud party on 2nd floor with bodies slamming into walls, and looked out window to see hooker and pimp making deal with another man in pickup in the parking lot."[78]

- A January 2010 review of a Super 8 property in Escondido, California stated: "This is a hooker hangout, doors slaming at 3:00 AM, You will hear pimps on their cellphones outside in the middle of the night. Ladies arriving at 4:00 AM, Management MUST be aware this is going on and condone this. I expected John Walsh to show up with a film crew."[79]

---

[74] https://www.tripadvisor.com/Hotel_Review-g41222-d217008-Reviews-
Days_Inn_by_Wyndham_Lanham_Washington_D_C-Lanham_Maryland.html
[75] https://www.yelp.com/biz/days-inn-and-suites-by-wyndham-se-columbia-ft-jackson-columbia
[76] https://www.tripadvisor.com/Hotel_Review-g60814-d89795-Reviews-or660-
Days_Inn_Suites_by_Wyndham_Savannah_Gateway_I_95_and_204-Savannah_Georgia.html
[77] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-
Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html
[78] https://www.tripadvisor.co/Hotel_Review-g60950-d74409-Reviews-
Super_8_by_Wyndham_Tucson_Downtown_Convention_Center-Tucson_Arizona.html
[79] https://www.tripadvisor.com/Hotel_Review-g32358-d235407-i132418454-Super_8_Escondido-
Escondido_California.html

- A February 2010 review of a Super 8 property in Los Angeles, California stated: "This place lacks security and there were drug dealers trying to push their products inside of the hotel. This place is Scary. The neighborhood was frightening and there were also prostitutes and homeless/addicts all over the place and renting rooms in the hotel. The desk guy looked at my friends attire (faux fur coat) and assumed he was a pimp and that we were prostitutes and seemed surprised that we had made reservations for more than one night. He kept giving us this strange smile... icky. This place left me with a bad feeling. If you want to stay here to save a few bucks my advice is to utilize the buddy system whenever you leave your room to visit the vending machines... after checking in for the night that is probably the only thing you will feel even moderately safe doing. eek. I can deal with scary hotels but this place is a disaster waiting to happen."[80]

- A June 2010 review of a Super 8 property in Virginia stated: "The location is in a very unsafe place. There were junkies and prostitutes using the premises of the hotel."[81]

- A July 2010 review of a Super 8 property in Texas stated: "After a night out parking lot full had to park under drive thur in front of hotel no other space. Number One reason to not stay here HOOKERS!!! walking the parking lot, walking the sidewalks and feeder road roads in front of Motel. All hours of the day."[82]

- An October 2011 review of a Super 8 property in Tennessee stated: "Don't stay here unless you want drugs or a prostitute....or both. There were drunks running up the halls all night and the maid offered to have sex with my husband for money. When he refused, she then offered to sell him pills."[83]

- A February 2012 review of a Super 8 property in Florida stated: "This hotel should not even be listed as a choice to stay in. Upon check, 3 rooms from me was a sexual battery crime scene. Prostitutes and drug deals were going on all over the property. The room was filthy, smelled horrible and I wouldn't even touch the bed! This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!! DO NOT STAY HERE!!"[84]

- An April 2012 review of a Super 8 property in Virginia stated: "Just beware, there are "escorts" who are constantly on the lookout for fresh meet. A pimp will knock on your door asking to use your cell to call his girlfriend. From then on, she will do the work."[85]

---

[80] https://www.tripadvisor.com/Hotel_Review-g32655-d235134-Reviews-Super_8_by_Wyndham_Hollywood_La_Area-Los_Angeles_California.html
[81] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-NorfolkChesapeake-Bay.h7202.Hotel-Reviews
[82] https://www.tripadvisor.com/Hotel_Review-g30196-d109015-Reviews-Super_8_by_Wyndham_Austin_North_University_Area-Austin_Texas.html
[83] https://www.tripadvisor.com/Hotel_Review-g55138-d97967-Reviews-or165-Super_8_by_Wyndham_Knoxville_Downtown_Area-Knoxville_Tennessee.html
[84] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html
[85] https://www.expedia.com/Manassas-Hotels-Super-8-By-Wyndham-Manassas.h12141.Hotel-Reviews

- An April 2012 review of a Super 8 property in Texas stated: "We have stayed in hotels all over the world and I have never had as terrible and frightening an experience as I had at this hotel. The place was crawling with prostitutes and seedy looking guys looking for prostitutes. We tried to stay here anyway, but the night manager started threatening us! In the end we had to call the police in order to safely leave. The police were very sympathetic, and apparently they have frequent problems with this hotel. Stay Away."[86]

- An October 2012 review of a Super 8 property in Florida stated: "the last time i stayed at this super 8, a hooker approached me in the parking lot and i informed you . this time there was a drug dealer in the next door room, cars coming and going all day & night a car would pull up and one person goes inside and 5 minutes later comes out. when i was checking out i told the desk clerk and the girl in the office says oh i know who that is. well if you knew about why was he still there. i will never stay there again, and i'm a loyal super 8 customer."[87]

- A March 2013 review of a Super 8 property in Louisiana stated: "There was a PROSTITUTE running her business from a room, with her pimp standing outside. She propositioned a co-worker as he was going to his room. Then in the middle of the night she and her clients were fighting very loudly over money and services issued!"[88]

- A March 2013 review of a Super 8 property in Ohio stated: "I've been solicited for drugs and by prostitutes here on several occassions. I told the hotel staff about it and they seem to turn a blind eye to the problem because these people are also buying rooms."[89]

- A February 2013 review of a Super 8 property in Minnesota stated: "This hotel was disgusting. Homeless man passed out in lobby, possible prostitute hanging out in hallway with pimp, cigarette smell, ridiculous noise level throughout night, etc. Dirty shoes in microwave, empty beer cans in fridge. I cannot express enough how terrible this place really is."[90]

- An April 2013 review of a Super 8 property in Georgia stated: "The hotel was filled with prostitutes and drug dealers and I was put in the back with my children which gave me no type of security. Super 8 needs to remove their name from this building."[91]

---

[86] https://www.tripadvisor.ca/Hotel_Review-g56003-d240483-Reviews-Super_8_by_Wyndham_Houston_Brookhollow_NW-Houston_Texas.html
[87] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html
[88] https://www.tripadvisor.ca/Hotel_Review-g40314-d120851-Reviews-FairBridge_Inn_Express_Metairie-Metairie_Louisiana.html
[89] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html
[90] https://www.tripadvisor.com/Hotel_Review-g43493-d247863-Reviews-Super_8_by_Wyndham_St_Cloud-Saint_Cloud_Minnesota.html
[91] https://www.tripadvisor.com/Hotel_Review-g34856-d217054-Reviews-Super_8_by_Wyndham_Atlanta_Hartsfield_Jackson_Airport-College_Park_Georgia.html

- A July 2013 review of a Super 8 property in California stated: "Our first night we were greeted by undercover police busting the prostitutes using the spare rooms to turn tricks. Maids make extra income unlocking vacant rooms. I would not recommend this place for children.Or anyone for that fact."[92]

- An August 2013 review of a Super 8 property in Ohio stated: "This hotel gives the Super 8 chain a bad reputation. The local restaurant management told us not to answer door due to prostitution issues."[93]

- An October 2013 review of a Super 8 property in Virginia stated: "We ended up wedging a pole in the door for safety reasons. After dark the place turned into, I do NOT exaggerate, a open hoer house. At lease 4 pimps were doing business with a dozen or so girls there. If not for the safety reasons it was a life experience seeing that side of society. We were surprised at a chain like Super 8 condoning this activity. . . . The big thing was the blatant open prostitution that was condoned by your chain was despicable. The car music blaring and loud laughing and yelling was just like out of a rap video. Shame on you Super 8 for condoning this kind of activity just to fill a room."[94]

165.    This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (H.E.W.) was trafficked at the subject properties, the Wyndham Defendants knew or should have known that:

a.    There was widespread and ongoing sex trafficking occurring at Wyndham branded properties.

b.    Sex trafficking was a brand-wide problem for Wyndham originating from management level decisions at their corporate offices in Parsippany, NJ.

c.    Wyndham franchisees and hotel staff were not taking reasonable steps to identify and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

d.    Wyndham's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

e.    Wyndham and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

---

[92] https://www.tripadvisor.com/Hotel_Review-g32655-d252254-Reviews-or50-Super_8_by_Wyndham_Canoga_Park-Los_Angeles_California.html
[93] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html
[94] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html

166.    Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Wyndham continued to earn revenue by continuing conduct that they knew or should have known would continue to facilitate that trafficking.

   2) *The Wyndham Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Wyndham Properties*

167.    Wyndham Defendants were specifically aware that sex trafficking was widespread and ongoing at the subject hotels.

168.    Internet reviews for the subject hotels and other Wyndham branded hotels in the surrounding area, which upon information and belief the Wyndham Defendants managed and monitored, show the pervasiveness of sex trafficking before and well after Jane Doe (H.E.W.) was trafficked.

169.    Traffickers, including Jane Doe (H.E.W.)'s traffickers, repeatedly chose to use the subject hotels for their sex trafficking activity. As such, Defendants also knew or should have known about the pervasive sex trafficking at the hotels based on obvious indicators of this activity.

170.    Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the subject hotels prior to Jane Doe (H.E.W.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to

violence, coercion, control, and exploitation.

171.    All knowledge from the staff at the hotels is imputed to Wyndham Franchisee Defendants. Wyndham Franchisee Defendants knew about this widespread and ongoing trafficking at the hotels, including the trafficking of Jane Doe (H.E.W.), through the direct observations of hotel staff, including management-level staff.

172.    Upon information and belief, Wyndham Franchisee Defendants knew or should have known about widespread and ongoing trafficking activity at the hotel property because of non-public information available because Wyndham Franchisee Defendants:

      a.  surveillance of the property;

      b.  internal investigations;

      c.  customer complaints;

      d.  monitoring of customer feedback;

      e.  information received from law enforcement; and

      f.  other sources of non-public information available to Wyndham Franchisee Defendants.

173.    Upon information and belief, Wyndham Brand Defendants knew or should have known about widespread and ongoing trafficking activity at the hotel property because of non-public information available because Wyndham Brand Defendants:

      a.  conducted regular inspections of the hotel property;

      b.  employed "field agents" to work with hotels on trafficking issues;

      c.  publicly represented that it monitored and audited hotels to determine the status of anti-trafficking efforts;

      d.  required franchisee and hotel staff to report suspected trafficking activity to Franchisor;

      e.  was involved in day-to-day consulting on operational issues at hotel;

f.   had access to surveillance systems;

g.   collected and monitored data that showed patterns consistent with trafficking;

h.   participated in internal investigations;

i.   solicited and received customer feedback and complaints;[95]

174.    Upon information and belief, under the Wyndham Brand Defendants' protocols, which on their face required hotel staff and management to report suspected criminal activity to the Wyndham Brand Defendants, hotel staff and management were required to report numerous instances of suspected sex trafficking to the Wyndham Brand Defendants prior to Jane Doe (H.E.W.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the subject Wyndham properties.

175.    Upon information and belief, Wyndham Brand Defendants adopted a protocol that, on its face, required hotel staff and franchisees to report suspected criminal activity, including suspected prostitution and sex trafficking, to Wyndham Brand Defendants. Based on the existence of this protocol and the widespread and obvious trafficking at the subject properties, there were multiple instances of suspected sex trafficking that were or should have been reported to Wyndham Brand Defendants.

176.    Wyndham Brand Defendants and the Franchisee Defendants had constructive knowledge of the widespread and ongoing trafficking at the properties because this trafficking resulted from their failure to exercise ordinary care operating the hotel.

> 3) *The Wyndham Defendants knew Jane Doe (H.E.W.) was being trafficked because of the apparent and obvious "red flags" of sex trafficking*

177.    During the period that Jane Doe (H.E.W.) was trafficked at the Wyndham

---

[95] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("In every case, Wyndham received the guest complaint, monitored the response, and tried to placate disgruntled guests with Wyndham Rewards hotel points.")

Properties, there were obvious signs, observed by hotel staff, that her trafficker was engaged in sex trafficking:

    a. The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards.

    b. The "Do Not Disturb" door hanger was used very frequently.

    c. Housekeeping staff was often prevented from entering the room for regular cleaning, towel exchange and other standard room services.

    d. There was heavy foot traffic in and out of Jane Doe (H.E.W.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

    e. Jane Doe (H.E.W.) had several johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

    f. When housekeeping was allowed in and after Jane Doe (H.E.W.) checked out, hotel cleaning staff would have noticed sex paraphernalia like condom wrappers and lubricant, as well as drug paraphernalia.

    g. Other girls were being trafficked at the same hotel at the same time as H.E.W. by her trafficker and other traffickers.

    h. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

178.    Based upon information and belief, multiple employees at the Wyndham properties, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

179.    As such, Wyndham Defendants knew or were willfully blind to the fact that Jane Doe (H.E.W.) was being trafficked at the subject Wyndham properties.

180.    Given these obvious signs, Wyndham Defendants knew or should have known about the trafficking of Jane Doe (H.E.W.) based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

181.    Wyndham Defendants also knew or should have known about Jane Doe (H.E.W.)'s trafficking based on the other methods, listed above, that they used to monitor and supervise the subject properties.

**B. The Wyndham Defendants facilitated sex trafficking, including the trafficking of Jane Doe (H.E.W.)**

182.    Wyndham Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (H.E.W.) at the subject Wyndham properties because the trafficking was the direct result of Defendants facilitating her trafficking at the properties.

1) *The Wyndham Franchisee Defendants facilitated sex trafficking at the Wyndham Properties*

183.    Wyndham Franchisee Defendants are responsible for the acts, omissions, and knowledge of all employees of the Wyndham properties when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Franchisee Defendants ratified these acts and omissions, and because Franchisee Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Wyndham Franchisee Defendants, of sex trafficking occurring at Wyndham properties including the subject locations.

184.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Wyndham properties, Wyndham Franchisee Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including Jane Doe (H.E.W.).

185.    Wyndham Franchisee Defendants knew or were willfully blind to the fact that Jane Doe (H.E.W.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (H.E.W.)'s sexual exploitation.

186.    Wyndham Franchisee Defendants also facilitated widespread trafficking at the Wyndham properties, including the trafficking of Jane Doe (H.E.W.), in ways including:

a.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human

trafficking;

b.  inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c.  choosing not to report known or suspected criminal activity including sex trafficking to the appropriate law enforcement agencies according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

d.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

   2) *Wyndham Brand Defendants facilitated the trafficking of Jane Doe (H.E.W.) at all Wyndham properties*

187.    Upon information and belief, the Wyndham Brand Defendants participated directly in aspects of the operation of the subject Wyndham properties that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Jane Doe (H.E.W.), as follows:

a.  assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

b.  assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor;

c.  assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

d.  assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e.  employing field-based associates who work with hotels on trafficking issues;

f.  assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g.  establishing systems for guests to report security issues to franchisor;

    h.   requiring franchisees to provide Wi-Fi/internet access to guests;

    i.   mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

    j.   setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

    k.   requiring franchisees to use a system to monitor and track housekeeping requests;

    l.   setting policies for when and how housekeeping services are provided;

    m.   collecting and monitoring data that shows patterns of use of housekeeping services;

    n.   setting policies for when and how hotel staff can accept tips.

188.    Wyndham Brand Defendants directly participated in and retained day-to-day control over renting rooms at the subject Wyndham properties by, among other things:

    a.   controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

    b.   controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

    c.   requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

    d.   reserving rooms and accept payments without requiring franchisee approval or involvement;

    e.   controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

    f.   requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

    g.   requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

    h.   requiring the franchisee to use a property-management system operated and controlled by the franchisor;

     i.   requiring the franchisee to use a data-management system operated and controlled by the franchisor;

     j.   ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

     k.   exercising control over the price of rooms;

     l.   controlling all details of the customer loyalty program that the franchisee was required to implement;

     m.  setting detailed policies for the check-in process, including requirements for identification and payment methods;

     n.   collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

     o.   assuming sole ownership over all guest information;

     p.   overseeing do not rent (DNR) lists for its branded properties.

189.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Wyndham properties, Wyndham Brand Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (H.E.W.).

190.    Wyndham Brand Defendants knew or should have known that Jane Doe (H.E.W.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (H.E.W.)'s sexual exploitation.

191.    Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Wyndham properties, the Wyndham Brand Defendants continued participating in a venture at that hotel, with its franchisees and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotel, including

but not limited to by the following:

    a.   adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

    b.   adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

    c.   adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

    d.   adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

    e.   providing traffickers continued access to Franchisor-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

    f.   adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at subject Wyndham properties;

    g.   implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

192.    If Wyndham Brand Defendants had exercised reasonable diligence when operating the Wyndham properties and in the areas where it retained control, Wyndham Brand Defendants would have prevented the Wyndham properties from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.). Instead, Wyndham Brand Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.).

**C. Wyndham Defendants' ventures at the Wyndham properties.**

193.    Through the conduct described above, Wyndham Defendants knowingly benefited

from engaging in a venture with sex traffickers at the Wyndham properties, including Jane Doe

(H.E.W.)'s trafficker, as follows:

> h.  Wyndham Defendants both received benefits, including increased revenue, every time a room was rented.

> i.  This venture engaged in violations of violated 18 U.S.C. §1591 through the actions of the criminal traffickers at the properties, which Wyndham Defendants knew or should have known about.

> j.  Wyndham Defendants associated with traffickers, including Jane Doe H.E.W.'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

> k.  Wyndham Defendants had a mutually beneficial relationship with the traffickers at the properties, fueled by sexual exploitation of victims.

> l.  Sex traffickers, including Jane Doe H.E.W.'s traffickers, frequently used Wyndham properties for their trafficking because of an implicit understanding that Wyndham properties were a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Wyndham Defendants facilitating that trafficking as described throughout this complaint. This resulted in benefits, including increased revenue, for Wyndham Defendants.

> m.  Wyndham Defendants participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

> n.  Jane Doe H.E.W.'s trafficking at the Wyndham properties was a result of Wyndham Defendants' participation in a venture with criminal traffickers. If Wyndham Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe H.E.W.'s trafficking at the Wyndham properties.

194.    Through the conduct described above, each of the Defendants also knowingly

benefited from engaging in a commercial venture with other Defendants and with hotel staff as

follows:

> a.  Wyndham Defendants continued to operate the Wyndham properties.

> b.  Pursuant to the terms of the franchising agreement, Wyndham Defendants received financial benefits from operating the properties, including revenue generated

specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

c. This venture violated 18 U.S.C. §1591(a) through the conduct of Wyndham Franchisee Defendants and the widespread sex trafficking at the properties.

d. Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §1591(a), Wyndham Brand Defendants participated in the venture by continuing to associate with Wyndham Franchisee Defendants to operate the properties in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe H.E.W.

e. Jane Doe H.E.W.'s trafficking was a result of Wyndham Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §1591(a) at the properties. Had Wyndham not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §1591(a), it would not have received a benefit from Jane Doe H.E.W.'s trafficking.

**D. Wyndham Franchisee Defendants and the Staff at the Wyndham Properties Acted as Actual Agents of Wyndham Brand Defendants.**

195.    Wyndham Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Wyndham and staff at the subject Wyndham properties, which are Wyndham's actual agents or subagents.

196.    The Wyndham Brand Defendants subjected Franchisee Defendants to detailed standards and requirements regarding the operation of the subject Wyndham properties through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Brand Defendants.

197.    The Wyndham Brand Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Wyndham Brand Defendants imposed on the franchisees:

a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendants used; and

b. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

c. dictated the specific manner in which Franchisee Defendants and hotel staff must carry out most day-to-day functions; and

d. significantly exceeded what was necessary for Wyndham Brand Defendants to protect its registered trademarks.

198.    In addition to the ways described above, upon information and belief, Wyndham Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over Wyndham Franchisee Defendants' day-to-day operation of the subject properties, including the following ways:

a. Wyndham Brand Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham to protect its registered trademarks;

b. Wyndham Brand Defendants maintained a team of regionally based trainers to provide training at branded hotels. Wyndham provided training for hotel management and select hotel staff on-site and at locations selected by Wyndham;

c. Wyndham Brand Defendants provided hotels staff with training it created through an online learning platform, Wyndham University, it controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d. Wyndham Brand Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. Wyndham Brand Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. Wyndham Brand Defendants maintained oversight in hiring, disciplining, and terminating hotel management and employees;

g.  Wyndham Brand Defendants required franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

h.  For certain products and services that franchisee was required to purchase to operate the property, Wyndham designated approved vendors and prohibited franchisee from purchasing goods and services from anyone other than an approved vendor;

i.  Wyndham Brand Defendants required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

j.  Wyndham Brand Defendants set required staffing levels for the subject properties;

k.  Wyndham Brand Defendants established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

l.  Wyndham Brand Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

m.  Wyndham Brand Defendants provided benefits for employees of franchised hotels;

n.  Wyndham Brand Defendants controlled channels for guests to report complaints or provide feedback regarding the subject properties and directly participated in the response and/or supervised and the response to customer complaints or other feedback. Wyndham retained the right to provide refunds or other compensation to guests and to require Franchisee Defendants to pay associated costs;

o.  Wyndham Brand Defendants generated reports and analysis of guest complaints and online reviews for the subject properties;

p.  Wyndham Brand Defendants set detailed requirements for insurance that Wyndham Franchisee Defendants must purchase;

q.  Wyndham Brand Defendants exercised or retained control over the franchisee's day-to-day accounting and banking practices;

r.  Wyndham Brand Defendants regularly audited the books and records of Franchisee Defendants;

s.  Wyndham Brand Defendants conducted frequent and unscheduled inspections of the subject properties;

t.  Wyndham Brand Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if franchisee violated any of Wyndham' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject properties;

u.  Wyndham Brand Defendants controlled all marketing for the subject properties, directly provided marketing services, and prohibited Franchisee Defendants from maintaining any online presence unless specifically reviewed and approved by Wyndham;

v.  Wyndham Brand Defendants exercised or retained control over all aspects of building and facility design;

w.  Wyndham Brand Defendants imposed detailed recordkeeping and reporting requirements on Franchisee Defendants regarding virtually all aspects of hotel operations;

x.  Wyndham Brand Defendants supervised and controlled day-to-day operations of the subject properties through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee Defendants to use;

y.  Wyndham Brand Defendants required the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis; and

z.  Wyndham Brand Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

199.  Upon information and belief, Wyndham Brand Defendants had the right to and did enforce its control over Wyndham Franchisee Defendants through various methods, including:

a.  the right to conduct detailed inspections of the subject properties;

b.  monitoring or auditing the Franchisee Defendants for compliance with policies and expectations;

c.  directing Franchisee Defendants to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d.  mandating training and education for franchisees and/or hotel staff;

e.  employing consultants or field agents to become involved in the day-to-day

operations of franchised hotels;

    f.   the right to impose fines or penalties;

    g.   the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services; and

    h.   the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

**E.  Wyndham Brand Defendants are jointly responsible for the trafficking of Jane Doe (H.E.W.)**

200.    All the Wyndham Brand Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

201.    Upon information and belief, operation of the subject properties was part of a single unified operation by Wyndham Brand Defendants. Upon information and belief, all Wyndham Brand Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, Wyndham Brand Defendants acted jointly to own, operate, control, manage, and supervise the subject properties. As an integrated enterprise and/or joint venture, Wyndham Brand Defendants were separately and jointly responsible for compliance with all applicable laws.

**VI.    The TVPRA violations at the Orangewood Inn and Suites.**

202.    On multiple occasions in 2012 and 2013, Jane Doe (H.E.W.) was trafficked at the Orangewood Inn and Suites. The Orangewood Inn and Suites Defendants each benefited from the rental of the rooms that were used to sexually exploit victims, including Jane Doe (H.E.W.). The Orangewood Inn and Suites Defendants knew or should have known they were facilitating sex trafficking at the Orangewood Inn and Suites, including the trafficking of Jane Doe (H.E.W.).

A.  **The Orangewood Inn and Suites Defendants Knowledge of Sex Trafficking**

203.    The Orangewood Inn and Suites Defendants have known, since well before Jane Doe (H.E.W.)'s trafficking, that there was widespread sex trafficking at the Orangewood Inn and Suites.

204.    Sex trafficking was prevalent at the Orangewood Inn and Suites and occurred in a way that was obvious and apparent.

205.    Public information, including online reviews, confirms both the widespread sex trafficking problem at the Orangewood Inn and Suites and the Orangewood Inn and Suites Defendants' knowledge of this sex trafficking. Upon information and belief, the Orangewood Inn and Suites Defendants monitored online reviews for indicia of criminal activity, including sex trafficking.

206.    Traffickers, including the trafficker of Jane Doe (H.E.W.), repeatedly returned to the Orangewood Inn and Suites because the hotel provided a favorable environment for trafficking due to policies and procedures adopted and implemented by the Orangewood Inn and Suites Defendants and because the hotel staff turned a blind eye to obvious signs of trafficking.

207.    There were obvious and apparent signs of this widespread trafficking activity, consistent with the well-known "red flags" of sex trafficking in the hospitality industry, that the Orangewood Inn and Suites Defendants knew or should have known about.

208.    The Orangewood Inn and Suites Defendants, acting individually and jointly, directly participated in operation of the Orangewood Inn and Suites and, therefore, directly monitored and supervised activity at the hotel.

209.    The Orangewood Inn and Suites Defendants are all affiliated entities subject to common control and that jointly operated the Orangewood Inn and Suites and shared revenue and

profit from operation of the hotel.

210.    All knowledge from the hotel staff at is imputed to the Orangewood Inn and Suites Defendants who jointly employ and/or control the hotel staff. The Orangewood Inn and Suites Defendants knew about this widespread and ongoing trafficking at the Orangewood Inn and Suites, including the trafficking of Jane Doe (H.E.W.), through the direct observations of hotel staff, including management-level staff, and information otherwise relayed to this staff by other staff members, guests, and other sources.

211.    Upon information and belief, in addition to public source of information about trafficking, the Orangewood Inn and Suites Defendants knew or should have known about the widespread trafficking at the Orangewood Inn and Suites based on non-public sources of information including but not limited to:

    a.   direct observation of hotel staff and management;

    b.   surveillance of the property;

    c.   customer complaints;

    d.   monitoring of online reviews and other customer feedback;

    e.   information received from law enforcement; and

    f.   other sources of non-public information available to the Orangewood Inn and Suites Defendants.

212.    The Orangewood Inn and Suites Defendants had constructive knowledge of the widespread and ongoing trafficking at the Orangewood Inn and Suites because this trafficking resulted from their failure to exercise ordinary care operating the hotel.

213.    During the period that Jane Doe (H.E.W.) was trafficked at Orangewood Inn and Suites, there were obvious signs, observed by hotel staff, that her trafficker was engaged in sex trafficking:

    a.   The rooms at this hotel would be booked in the name of one of the johns or another victim who was being trafficked at this hotel at the same time.

    b.   Jane Doe (H.E.W.)'s trafficker was trafficking other victims at this hotel at or around the same time Jane Doe (H.E.W.) was being trafficked there.

    c.   The hotel rooms in which she was trafficked were frequently paid for with prepaid cards.

    d.   Jane Doe (H.E.W.)'s trafficker would not allow housekeeping to enter the room where Jane Doe (H.E.W.) was being exploited. Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services.

    e.   The trafficker was often present with Jane Doe (H.E.W.) at check in and would linger around the hotel or in the parking lot while she was with a john.

    f.   Jane Doe (H.E.W.)'s trafficker beat her in the rooms of this hotel, causing her to suffer visible injuries.

    g.   Jane Doe (H.E.W.)'s demeanor reflected her fear of her trafficker and the control he was exercising over her.

    h.   There was heavy foot traffic in and out of Jane Doe (H.E.W.)'s room involving men who were not hotel guests.

    i.   Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel, including but not limited to those described above.

214.    Based upon information and belief, multiple employees at the Orangewood Inn and Suites, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

215.    Based on this and on the other methods, listed above, that they used to monitor and supervise the Orangewood Inn and Suites, the Orangewood Inn and Suites Defendants knew or were willfully blind to the fact that Jane Doe (H.E.W.) was being trafficked at the Orangewood Inn and Suites.

216.    Given these obvious signs, the Orangewood Inn and Suites Defendants knew or

should have known about the trafficking of Jane Doe (H.E.W.) based on their policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

217.    The Orangewood Inn and Suites Defendants also knew or should have known about Jane Doe (H.E.W.)'s trafficking based on the other methods, listed above, that they used to monitor and supervise the Orangewood Inn and Suites.

218.    The Orangewood Inn and Suites Defendants had constructive knowledge of the trafficking of Jane Doe (H.E.W.) at the Orangewood Inn and Suites because her trafficking was the direct result of their facilitation of trafficking at that hotel.

**B.  The Orangewood Inn and Suites Defendants facilitated sex trafficking, including the trafficking of Jane Doe (H.E.W.)**

219.    The Orangewood Inn and Suites Defendants facilitated widespread sex trafficking at the Orangewood Inn and Suites, including the trafficking of Jane Doe (H.E.W.).

220.    The Orangewood Inn and Suites Defendants were responsible for the acts, omissions, and knowledge of all employees of the Orangewood Inn and Suites when operating the hotel because these acts and omissions were committed in the scope and course of employment, because they ratified these acts and omissions, and because they failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to them, of sex trafficking occurring at this hotel.

221.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Orangewood Inn and Suites, the Orangewood Inn and Suites Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

222.    The Orangewood Inn and Suites Defendants knew or were willfully blind to the fact that Jane Doe (H.E.W.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing a venue and tools, in the form of hotel rooms and

related services, to facilitate Jane Doe (H.E.W.)'s sexual exploitation.

223.    The Orangewood Inn and Suites Defendants also facilitated widespread trafficking at the Orangewood Inn and Suites, including the trafficking of Jane Doe (H.E.W.), in ways including:

     a.  following inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to on-premises crime and specifically human trafficking;

     b.  choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable policies and procedures;

     c.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

     d.  continuing to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Orangewood Inn and Suites.

     e.  despite having specific knowledge of policies that would significantly reduce sex trafficking at the Orangewood Inn and Suites, declining to implement policies that would likely have the effect of reducing its sex-trafficking related profits or draw negative public attention by acknowledging the ongoing sex trafficking at the Orangewood Inn and Suites.

     f.  allowing traffickers to reserve rooms using cash or prepaid cards, which provided relative anonymity and non-traceability.

     g.  adopting check in procedures that failed to ensure all hotel guests and visitors were appropriately identified and, instead, allowing traffickers and johns to use the hotel with minimal risk of traceability.

224.    If the Orangewood Inn and Suites Defendants had exercised reasonable diligence when operating the Orangewood Inn and Suites, then the Orangewood Inn and Suites Defendants would have prevented the Orangewood Inn and Suites from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.). Instead, the Orangewood Inn and Suites Defendants engaged in conduct that affirmatively facilitated

widespread and ongoing sex trafficking, including the trafficking of Jane Doe (H.E.W.).

### C. The Orangewood Inn and Suites Defendants' ventures

225.    Through the conduct described above, the Orangewood Inn and Suites Defendants

knowingly benefited from engaging in a venture with sex traffickers at the Orangewood Inn and

Suites, including Jane Doe (H.E.W.)'s trafficker, as follows:

> o.   The Orangewood Inn and Suites Defendants received benefits, including increased revenue, every time a room was rented at the Orangewood Inn and Suites.

> p.   This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Orangewood Inn and Suites, which the Orangewood Inn and Suites knew or should have known about.

> q.   The Orangewood Inn and Suites Defendants associated with traffickers, including Jane Doe (H.E.W.)'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

> r.   The Orangewood Inn and Suites Defendants had a mutually beneficial relationship with the traffickers at the Orangewood Inn and Suites, fueled by sexual exploitation of victims, including Jane Doe (H.E.W.).

> s.   Sex traffickers, including Jane Doe (H.E.W.)'s traffickers, frequently used the Orangewood Inn and Suites for their trafficking because of an implicit understanding that the Orangewood Inn and Suites was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of the Orangewood Inn and Suites Defendants facilitating that trafficking as described throughout this Complaint. This resulted in benefits, including increased revenue, for the Orangewood Inn and Suites Defendants.

> t.   The Orangewood Inn and Suites Defendants participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

> u.   Jane Doe (H.E.W.)'s trafficking at the Orangewood Inn and Suites was a result of the Orangewood Inn and Suites Defendants' participation in a venture with criminal traffickers. If the Orangewood Inn and Suites Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (H.E.W.)'s trafficking at the Orangewood Inn and Suites.

226.    Through the conduct described above, the Orangewood Inn and Suites Defendants also knowingly benefited from engaging in a commercial venture with one another and with the hotel staff operating the Orangewood Inn and Suites as follows:

g.   The Orangewood Inn and Suites Defendants associated with one another and the hotel staff to operate the Orangewood Inn and Suites.

h.   On information and belief, each of the Orangewood Inn and Suites Defendants received financial benefits from operating the Orangewood Inn and Suites, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

i.   By participating in a venture that facilitated sex trafficking, the Orangewood Inn and Suites Defendants also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Orangewood Inn and Suites specifically.

j.   This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of the hotel staff and the widespread sex trafficking at the Orangewood Inn and Suites.

k.   Despite their actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Orangewood Inn and Suites Defendants participated in the venture by continuing to associate with Franchisee Defendant to operate the Orangewood Inn and Suites in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe (H.E.W.).

l.   Jane Doe (H.E.W.)'s trafficking at the Orangewood Inn and Suites was a result the Orangewood Inn and Suites Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Orangewood Inn and Suites. Had each Orangewood Inn and Suites Defendant not continued participating in a venture that each knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the defendant would not have received a benefit from Jane Doe (H.E.W.)'s trafficking at the Orangewood Inn and Suites.

## CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

227.    Jane Doe (H.E.W.) incorporates all other allegations.

**I.    Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee Defendants and Orangewood Inn and Suites Defendants)**

228.    Jane Doe (H.E.W.) is a victim of sex trafficking within the meaning of § 1591 and

1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

229.    All Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because each of these Defendants:

      a.    violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Amended complaint, it harbored individuals (including Jane Doe (H.E.W.) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property.

      b.    violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Amended complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel property.

230.    Violations of 18 U.S.C §1595(a) by each of these Defendants as "perpetrator" operated, jointly, with other unlawful acts and omissions alleged in this Amended complaint, to cause Jane Doe (H.E.W.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**II.    Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants)**

231.    Jane Doe (H.E.W.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

232.    Through acts and omissions described throughout this Complaint, each of the Defendants received a financial benefit from participating in a venture with traffickers, including Jane Doe (H.E.W.)'s traffickers, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (H.E.W.)'s traffickers, were engaged in violations of 18

U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, each Defendant is liable as a beneficiary under 18 U.S.C §1595(a).

233.    Through the acts and omissions described throughout this Complaint, each Defendant received a financial benefit from participating in a venture with other Defendants operating its respective hotel property despite the fact that each Defendant knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

234.    Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (H.E.W.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

### III.    Vicarious Liability for TVPRA Violations (Franchisor Defendants and Orangewood Inn and Suites Defendants)

235.    The Franchisee Defendants acted as the actual agents of the Franchisor Defendants when operating the subject properties.

236.    Through the acts and omissions described throughout this Complaint, the Franchisor Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate the Embassy Suites Buffalo.

237.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

238.    As alleged above, Franchisee Defendants are directly liable to Jane Doe (H.E.W.) for violations of the TVPRA, both as perpetrators under 18 U.S.C §1591(a) and as beneficiaries under 18 U.S.C §1595(a). The Franchisor Defendants are vicariously liable to Jane Doe (H.E.W.) for those same violations.

239.    Under the TVPRA and the federal common law, each member of a joint venture is

vicariously liable for the acts and omissions of all other members of that joint venture.

240.    Under the TVPRA and the federal common law, an entity vicariously liable for the acts and omissions of its alter-egos.

241.    On information and belief, each of the Franchisor Defendants participated in a joint venture franchising and operating their subject properties. These Defendants had highly integrated operations, shared revenue and profits generated from the hotel, and exercised mutual control over the venture at the hotel. They functioned as a single integrated entity and/or as alter-egos of one another.

242.    On information and belief, each of the Orangewood Inn and Suites Defendants participated in a joint venture operating the Orangewood Inn and Suites. They had highly integrated operations at the hotel, shared revenue and profits generated from the hotel, and exercised mutual control over the venture at the hotel. They functioned as a single integrated entity and/or as alter-egos of one another.

243.    Each of the Franchisor Defendants is vicariously liable for the TVPRA violations of each of its other Brand Defendants.

244.    Each of the Orangewood Inn and Suites Defendants is vicariously liable for the TVPRA violations of each of the other Orangewood Inn and Suites Defendants.

## DISCOVERY RULE

245.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (H.E.W.) invokes the discovery rule. At the time she was harmed and through at least 2014, Jane Doe (H.E.W.) was under coercion and control of traffickers who abused and manipulated her. Thus, Jane Doe (H.E.W.) did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the

control of her trafficker, Jane Doe (H.E.W.) —through no fault of her own—lacked the information to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of H.E.W. being kept under the control of her traffickers, which Defendants facilitated.

246.    At the time Jane Doe (H.E.W.) was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendants' hotel or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed..

247.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (H.E.W.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (H.E.W.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (H.E.W.) filed this lawsuit.

248.    As a result of her continuous trafficking at the subject properties through at least 2014, Jane Doe (H.E.W.) was beaten, drugged, sexually assaulted, and mentally abused. She lacked the mental capacity to recognize the extent and scope of her injuries or those responsible particularly those who financially benefited from her trafficking but may not have been seen to be directly involved.

249.    Jane Doe (H.E.W.) was under the continuous control of her traffickers through at least 2014. As a result, she did not have the freedom to investigate her claims, to identify those responsible or to seek legal representation necessary to pursue her legal rights.

250.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe

(H.E.W.) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

251.    Jane Doe (H.E.W.) was subject to continuous trafficking at the subject properties through at least 2014, which is not more than 10 years before Jane Doe (H.E.W.) filed this lawsuit. This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the subject properties and Defendants' ongoing venture with one another and with criminal traffickers.

## DAMAGES

149.    The Defendants' acts and omissions, individually and collectively, caused Jane Doe (H.E.W.) to sustain legal damages.

150.    Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (H.E.W.).

151.    Jane Doe (H.E.W.) is entitled to be compensated for personal injuries and economic damages, including:

    a. Actual damages (until trial and in the future)

    b. Direct damages (until trial and in the future)

    c. Incidental and consequential damages (until trial and in the future)

    d. Mental anguish and emotional distress damages (until trial and in the future)

    e. Lost earnings and lost earning capacity (until trial and in the future)

    f. Necessary medical expenses (until trial and in the future)

    g. Life care expenses (until trial and in the future)

    h. Physical pain and suffering (until trial and in the future)

    i. Physical impairment (until trial and in the future)

    j. Unjust enrichment (until trial and in the future)

k. Exemplary/Punitive damages.

l. Attorneys' fees

m. Costs of this action

n. Pre-judgment and all other interest recoverable

## **JURY TRIAL**

152.    Jane Doe (H.E.W.) demands a jury trial on all issues.

## **RELIEF SOUGHT**

153.    WHEREFORE, Jane Doe (H.E.W.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (H.E.W.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (H.E.W.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

__/s/ Annie McAdams__
ANNIE MCADAMS, PC
2200 Post Oak, Suite 1000
PNC Tower, 10th Floor
Houston, Texas 77056
713.785.6262 - phone
866.713.6141 - fax
annie@mcadamspc.com

**ATTORNEY FOR PLAINTIFF**