IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JANE DOE (H.E.W.), | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:23-CV-1456-RP |
| | § | |
| | § | |
| RADISSON HOSPITALITY, INC., et al., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court is Defendant A&D Hotel LLC's ("A&D" or "the Orangewood Inn")[1] Motion for Summary Judgment ("MSJ"). (MSJ, Dkt. 168). Plaintiff Jane Doe ("H.E.W.") filed a response, (Dkt. 172), and A&D replied, (Dkt. 174). Also before the Court is A&D's Motion for In Camera Review and Motion to Seal Portions of Deposition Testimony, to which H.E.W. responded. (Mot., Dkt. 170; Resp., Dkt. 175). Having considered the parties' submissions, the record, and the applicable law, the Court will deny A&D's Motion for Summary Judgment, (Dkt. 168), and will grant in part and deny in part A&D's Motion for In Camera Review and Motion to Seal Portions of Deposition Testimony, (Dkt. 170).

## I. BACKGROUND

This is a case brought under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591, 1595, which includes a civil right of action for victims of sex trafficking against their traffickers and against those who benefitted from the trafficking.

---

[1] A&D does business as "the Orangewood" or "the Orangewood Inn & Suites." (Desai Dep., Dkt. 172-7, at 13:16–21). The Court uses the names interchangeably.

### A. Timeline of H.E.W.'s Alleged Trafficking

H.E.W. testifies that she was a victim of sex trafficking between July 2013 and February 2014. (H.E.W. Dep., Dkt. 172-2, at 15:3–15; 19:8–10; 33:7–21). According to H.E.W., she had been working at a nursing home but was fired in July 2013 for stealing Vicodin, to which she was addicted. (*Id.* at 34:1–19). Her first trafficker, I.R., picked her up from her job the day she was fired. (*Id.* at 93:19–21). Though the timeline is not entirely clear, (*id.* at 96:21–23, 97:22–25), H.E.W. states that I.R. drove H.E.W. to I.R.'s sister's apartment in Austin, Texas, where I.R. physically abused H.E.W. to prevent her from leaving. (*Id.* at 97:24–25, 98:1–4).

After she slept in his sister's apartment overnight, H.E.W. testifies that I.R. took her to the Orangewood Inn, a hotel operated by A&D. (*Id.* at 102:14–25; Desai Dep., Dkt. 172-7, at 13:16–21). She states that the two of them "booked a room" at the Orangewood with a front desk employee and that at this time she was "[b]adly bruised." (H.E.W. Dep., Dkt. 172-2, at 103:9–20). H.E.W. did not ask the front desk employee for help because she "was scared to." (*Id.* at 104:1–2). I.R. then "posted [photos of her] online" on a website called Backpage. (*Id.* at 103:9–10, 104:3–19). I.R. would then "force [her] to see johns," i.e., men paying for sex, who had responded to the Backpage ad. (*Id.* at 105:10–12). After the "john" left, I.R. would come back into the room and take the cash paid by the man. (*Id.* at 106:8–10). H.E.W. testifies that this was the first time she had been involved in this type of sex for money. (*Id.* at 106:17–21). According to H.E.W., she was ultimately trafficked by I.R. for three to four weeks, during which she was forced to be with three to four "johns" per day. (*Id.* at 109:3–15; 115:11–13). During this three-to-four-week period, the Orangewood Inn is the only hotel she could specifically recall being trafficked in, and she testifies that she spent "six to eight nights total" at the Orangewood Inn. (*Id.* at 109:16–23; 110:1–7).

H.E.W. then "escaped from [I.R.]" and drove to Shreveport, Louisiana, where she stayed with "P.W.," "[a]n acquaintance" who she "thought . . . was a friend" and who had previously sold

her marijuana. (*Id.* at 108:21–22; 109:1–2; 113:23–25; 114:18–24). H.E.W. testifies that she told P.W. about I.R. beating her and forcing her to have sex with men for money. (*Id.* at 121:2–3). P.W. "acted concerned," but when the two of them returned to Austin together a few days later, "he told [her] that he would . . . beat [her] if [she] didn't do what he said and forced [her] to do the same thing." (*Id.* at 121:6–16). She states that P.W. then trafficked her in Austin for approximately two months, forcing her to have sex with johns by "threatening . . . to expose [her] online and to physically abuse [her]."[2] (*Id.* at 125:17–25; 126:15–19). She testifies that P.W. trafficked her at hotels but does not remember any specific hotel from this time period. (*Id.* at 126:3–10). After those two months, she escaped in her car while P.W. was sleeping. (*Id.* at 126:11–14).

H.E.W. cannot remember exactly what she did next, but she recalls ending up at a nightclub a few days later. (*Id.* at 131:3–12). Around this time, she considered reporting her trafficking to the police, but she chose not to. (*Id.* at 133:9–14). H.E.W. was at the nightclub for a couple of hours and was then invited to an after-party at someone's house by a man at the club. (*Id.* at 134:15–18). At the house, after she had been drinking, she was given crystal meth by O.O., who would become her third trafficker. (*Id.* at 136:1–25; 137:1–3; Interr. No. 5, Dkt. 168-1, at 225). She states that her use of methamphetamine that night was voluntary. (H.E.W. Dep., Dkt. 172-2, at 136:18–19). H.E.W., O.O., and "his friend," A.A., then "ended up" at the Orangewood Inn. (*Id.* at 137:18–23). She states that she had agreed to go to a hotel with them but did not know he meant the Orangewood Inn until they arrived. (*Id.* at 139:5–9).

Once at the Orangewood Inn, H.E.W. testifies that O.O. continued to supply her with crystal meth, such that she "became addicted . . . [v]ery quickly." (*Id.* at 141:6–13). Based on this

---

[2] H.E.W. clarified that by "exposing her online," she meant that P.W. threatened to post screenshots of the Backpage online ads with her photos on Facebook. (*Id.* at 126:21–25). She later testified that P.W. did post screenshots of her Backpage ads on his Facebook page after she escaped from him "as . . . retaliation." (*Id.* 129:3–25).

drug use, she states that she lost her judgment and has a distorted memory from this time period. (*Id.* at 141:17–142:5). A "few days later," O.O., with the help of A.A., began trafficking her at the Orangewood Inn and other hotels.[3] (*Id.* at 142:6–9, 143:16–17). She claims that they posted photos of her Backpage ads, stating that she could not resist them taking photos because she was under the influence. (*Id.* at 142:18–143:8). She also claims that O.O. convinced her to go to a hotel room to "model for photos" for money to help pay for crystal meth, but when she got there, she was forced to have sex with a man for money. (Interr. No. 5, Dkt. 168-1, at 225). She testifies that O.O. subsequently threatened her with physical violence if she did not comply with his demands to have sex with customers. (*Id.*).

While trafficked by O.O., H.E.W. states that she had a "repeat customer" at the Orangewood Inn. (H.E.W. Dep., Dkt. 172-2, at 145:18–25). She also states that it "was a regular thing" for O.O. to host "loud 'after-parties' involving drug use" in their rented rooms at the Orangewood Inn. (*Id.* at 384:18–385:5). According to H.E.W., O.O. "brought [her] to the Orangewood Inn approximately five or six times between October 2013 and the end of January 2014." (H.E.W. Decl., Dkt. 172-26, at 2). She "specifically remember[s] being at the Orangewood Inn during the winter, toward the end of [her] trafficking period."[4] (*Id.* at 1). She described the Orangewood Inn as being "one of the hotels [O.O. and his associate] brought [her] to most

---

[3] She testifies that the first time O.O. trafficked her at the Orangewood Inn, they were there for three to four nights. (*Id.* at 140:19–21).

[4] Other testimony from H.E.W. conflicts with this declaration about when she was trafficked at the Orangewood Inn. For instance, H.E.W. stated in an interrogatory response that she had been trafficked at the Orangewood Inn "throughout 2012 and 2013." (Interr. No. 2, Dkt. 168-1, at 224). She also stated in a different interrogatory response that she had been trafficked at the Orangewood Inn "on multiple occasions July 2013 to February 3, 2014." (Interr. No. 15, Dkt. 168-1, and 237). The latter testimony conflicts other evidence, which indicates H.E.W. was arrested on February 3, 2014, at a Days Inn hotel rather than the Orangewood Inn, and that she had "[m]aybe" been at the Days Inn for "two nights" prior to that arrest. (*See, e.g.*, H.E.W. Dep., Dkt. 172-2, at 67:13–14, 148:13–23; Austin Police Dep't Records, Dkt. 172-4, at 20).

frequently" and stated that "[e]ach stay at the Orangewood Inn lasted between two and four days." (*Id.* at 1–2).

Around January 2014, H.E.W.'s mother reported to the Austin Police Department ("APD") that her daughter was missing. (APD Investigator Report, Dkt. 172-4, at 7; Miljenovich Dep., Dkt. 172-9, at 102:8–13). Her mother, who had seen photos posted of H.E.W. in "provocative poses on Facebook" and "found an [advertisement] of H.E.W. on Backpage," had been concerned that H.E.W. was involved in relationships with dangerous men and believed that her daughter "might be being forced to engage in commercial sex." (Miljenovich Dep., Dkt. 172-9, at 103:8–17, 109:11–15; APD Investigator Report, Dkt. 172-4, at 7). APD officers then conducted a "sting operation" on February 3, 2014, such that "an undercover agent engaged with H.E.W. directly" and then "gave some . . . signal" that caused other officers to enter the room and place H.E.W. under arrest. (Miljenovich Dep., Dkt. 172-9, at 116:1–4, 12–18). H.E.W. testifies that she was "shocked, but [she] was relieved." (H.E.W. Dep., Dkt. 172-2, at 212:16–21).

While still at the Days Inn, APD Officer Wade asked H.E.W. who had rented the room for her, and H.E.W. responded, "a friend." (APD Investigator Report, Dkt. 172-4, at 9). H.E.W. informed the officers that she had methamphetamine in her wallet. (*Id.*). APD noted that she had few possessions in the hotel room and no cash despite having seen buyers at the hotel for several days. (Miljenovich Dep., Dkt. 172-9, at 137:5–138:5).

H.E.W. was then taken to an APD location to be interviewed. (*Id.* at 10). She described to APD officers that she "started dancing and doing body massages" to make money after dropping out of high school. (*Id.*). H.E.W. also described one of her traffickers as "like a brother to her." (*Id.*; MSJ Resp., Dkt. 172, at 20 n.117; H.E.W. Dep., Dkt. 172-2, at 138:1–16). She told them that the trafficker had taught her how to box and that they had met at a gym; H.E.W. later testified at her deposition that it "appears [she] made some of [this] up," as she does not know how to box and did

not meet him at a gym. (APD Investigator Report, Dkt. 172-4, at 10; H.E.W. Dep., Dkt. 233:2–10). Officer Wade advised H.E.W. that "if she desired to leave the [sex] industry and wished for assistance," that APD "would do what [it] could to help locate services for her." (APD Investigator Report, Dkt. 172-4, at 10). H.E.W. "thanked [Officer Wade] but admitted she was not sure she wanted out of the industry yet." (*Id.*). H.E.W. was then booked in Travis County jail for prostitution and possession of a controlled substance. (*Id.*). No men were arrested in connection with H.E.W.'s alleged sex trafficking.

She testifies that none of the events described above constituted prostitution in her mind, as prostitution is "willingly taking part in sex work," whereas she was forced to have sex with customers. (H.E.W. Dep., Dkt. 172-2, at 20:10–13). H.E.W. told a psychologist: "While I was being trafficked I was made to feel like it was somehow my choice . . . . They made me afraid to get caught so it made me feel mixed up in my head about whether or not I was doing things by choice. Now being on the other side of it come, it's easier to see that I was being forced, controlled and manipulated." (Psychological Eval., Dkt. 172-13, at 9).

### B. Testimony Regarding Hotel Staff Knowledge

H.E.W. testified to certain facts that she believes would have given hotel staff reason to know a sex trafficking operation was being conducted in their hotel. For instance, she testified that she had stayed in one hotel for four nights and kept the do-not-disturb sign on the door the entire time; she does not remember which hotel this occurred at. (H.E.W. Dep., Dkt. 172-2, at 194:18–195:4). According to H.E.W., the Orangewood Inn reportedly "was a known 'trafficking' location because of how easy it was to get away with there and the staff never intervened." (Interr. No. 8, Dkt. 172-5, at 6). She stated: "We checked into [the Orangewood Inn] each time using our own IDs that had Austin addresses. We would come and go and there would always be a lot of male traffic to and from the rooms. . . . We were allowed to extend our hotel room rentals by paying with cash or

prepaid cards on a daily basis, staying up to a week at times. Staff didn't question our activities and allowed it to happen to [her] and other females." (Interr. No. 11, Dkt. 172-5, at 7). She testifies that she personally extended her room rental at the Orangewood Inn with cash and personally requested additional towels (approximately two to three) daily. (*Id.* at 197:1–198:3). H.E.W. also claims that she saw her traffickers tipping staff at "all hotels" she was trafficked at. (*Id.* at 264:16–265:3).

Additionally, as described in Section I(A), *supra*, H.E.W. testifies that she was "badly bruised" the first time she was taken to the Orangewood Inn. (*Id.* at 103:16–20). She claims she had "[b]lack eyes" and was "bruised all over [her] arms and [her] face." (*Id.* at 100:12–14). H.E.W. further testifies that at the Orangewood Inn "[t]here were frequent noise disturbances from myself, and other females being physically abused." (Interr. No. 13, Dkt. 172-5, at 7). Finally, H.E.W. asserts that "[t]here were other pimps and traffickers with female victims [at the Orangewood Inn] each time we were there," and there "was never any type of security present."[5] (*Id.*; Interr. No. 14, Dkt. 172-5, at 8).

### C. Testimony Regarding A&D Policies

Amit Desai ("Desai"), the corporate representative of A&D,[6] testified regarding policies and procedures at the Orangewood Inn. He states that it was A&D's policy that housekeeping was required to enter a hotel room "at least every two days" to clean it, even if a "do not disturb" sign was hanging. (Desai Dep., Dkt. 172-7, at 69:2–25, 70:6–12). Housekeeping kept a record of which rooms were cleaned on a certain day and which would need to be cleaned the next day. (*Id.* at 70:1–5). If a guest refused cleaning services, Desai claims that the guest would "either have to check out, if they don't like our policy, or they have to get the room cleaned." (*Id.* at 72:1–7). Guests were

---

[5] By contrast, H.E.W. testifies that her traffickers "wouldn't go to the Red Roof [Inn] because they started putting like security . . . . They wouldn't let people drive in and out. There was a secur[ity] guard at the Red Roof." (H.E.W. Dep., Dkt. 172-2, at 347:12–21).
[6] Desai is the managing member of A&D Hotels LLC. (Desai Dep., Dkt. 172-7, at 28:1–3).

reportedly limited in the number of extra towels or linens they could ask for during their stay, and Desai stated that it would be "unusual" if guests were asking for extra towels or linens every day of their stay. (*Id.* at 87:18–88:13). Guests using towels in an unusual way, such as leaving black stains or smudges on towels, would also be something the hotel employees would address. (*Id.* at 105:8–106:10).

The Orangewood Inn had closed circuit cameras around the property, including in hallways and the parking lot, and those "circuit cameras were monitored 24 hours a day by . . . employees." (*Id.* at 61:18–62:4). The hallways of the Orangewood Inn are enclosed; there are "no exterior hallways or balconies." (*Id.* at 62:8–11). Desai claims that "when there is suspicious activity, there's always traffic in the room going in and out. And we see that on cameras right away, and we would know right away. And . . . there's a certain path they all – you know, they all try to take . . . where they think the cameras will not catch them." (*Id.* at 104:21–105:4).

If housekeeping staff observed abnormal behavior, such as drug use or prostitution, they were meant to report that behavior to the front desk. (*Id.* at 74:7–13). The front desk staff would then call the guest room and attempt to resolve the issue over the phone; if the issue was not resolved, they would then call the police. (*Id.* at 74:16–25). According to Desai, he trained his staff to look out for "a lot of traffic" coming in and out of a room, particularly "unregistered guests," as that was a sign of prostitution. (*Id.* at 75:23–76:5). He acknowledged that he did not train staff on the difference between prostitution and sex trafficking, as he himself does not know enough about sex trafficking to differentiate between the two. (*Id.* at 77:12–25). Desai acknowledges that there were calls to the Austin Police Department regarding "compel[ed] prostitution" at the Orangewood Inn in August 2011 and September 2012. (*Id.* at 121:6–16, 124:6–125:19; APD Records, Dkt. 172-12, at 15, 19).

Regarding check-in policies, Desai states that guests are required to provide an ID and a credit card. (*Id.* at 78:6–11). Even guests who paid in cash are required to provide a credit card, as the hotel would charge the credit card a $100 deposit for the length of the stay; a debit card or prepaid card would not be sufficient. (*Id.* at 78:11–16, 77:2–7). He cannot remember when exactly he put into place this rule but claims "it's been there for a while now." (*Id.* at 80:13–15).

## II. LEGAL STANDARDS

### A. Motion for Summary Judgment

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Where the movant "bears the burden of proof at trial, it must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991) (citation omitted). After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). Unsubstantiated assertions, improbable inferences, and

unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

### B. Motion for In Camera Review and to Seal Portions of Deposition Testimony

"[T]he public has a common law right to inspect and copy judicial records," but this "right is not absolute." *S.E.C. v. Van Waeyenberghe*, 990 F.2d 845, 848 (5th Cir. 1993) (citing *Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 597 (1978)). In exercising its discretion to seal a judicial record, a court "must balance the public's common law right of access against the interests favoring nondisclosure." *Id.* District courts should "at least "articulate any reasons that would support sealing [a judicial document]."' *United States v. Sealed Search Warrants*, 868 F.3d 385 (5th Cir. 2017) (quoting *Van Waeyenberghe*, 990 F.2d at 849)). Moreover, courts "must also consider whether alternative measures, such as redaction or pseudonymity, would instead sufficiently protect the privacy interests at issue." *Sealed Appellant v. Sealed Appellee*, No. 22-50707, 2024 WL 980494 (5th Cir. Mar. 7, 2024) (per curiam) (citing *United States v. Ahsani*, 76 F.4th 441, 453 (5th Cir. 2023)). Additionally, to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," a court may "forbid[] inquiry into certain matters" and may "require[e] that a deposition be sealed." Fed. R. Civ. P. 26(c)(1).

### III. DISCUSSION

A&D moved for summary judgment on two bases: (1) H.E.W. has not produced evidence to support that A&D knowingly benefited from her alleged trafficking and (2) the ten-year statute of

limitations has run on H.E.W.'s alleged trafficking at A&D. The Court will consider these arguments

in turn, beginning with the statute of limitations argument.

### A. Motion for Summary Judgment

### 1. Statute of Limitations

Under the TVPRA, claims must be brought within "10 years after the cause of action arose,"

or "10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the

alleged offense," whichever date is later. 18 U.S.C. § 1595(c). Based on the instant action being filed

on November 30, 2023, A&D asserts that the statute of limitations bars claims based on any

complained-of conduct predating December 1, 2013. (MSJ, Dkt. 168, at 13). A&D also argues that

H.E.W. "lacks admissible evidence of when she was trafficked at the A&D hotel and relies upon her

inconsistent uncorroborated evidence" and that her testimony is not credible.[7] (MSJ, Dkt. 168, at

13–14).

H.E.W. responds that, to the contrary, the statute of limitations does not bar her claims

against A&D because (1) she does allege being trafficked at the Orangewood Inn after December 1,

2023; (2) the continuing violations doctrine applies; and (3) the discovery rule applies.[8] (Resp., Dkt.

172, at 18–20).

---

[7] Of course, the Court may not make credibility determinations at this stage, making A&D's credibility-based argument irrelevant. *See Reeves*, 530 U.S. at 150.

[8] Doe also argues that the Court could apply the doctrine of equitable tolling, pointing to "extraordinary circumstances due to ongoing trafficking . . . which resulted in her being dependent on crystal meth, financially dependent on her trafficker, pregnant, and with her freedom significantly restricted." (Resp., Dkt. 172, at 20). But, given that she first contemplated filing this lawsuit in 2018 yet nevertheless waited to do so until 2023 without explanation, (H.E.W. Dep., Dkt. 172-2, at 76:13–77:12), the Court finds that applying equitable tolling would be inappropriate. *See, e.g.*, *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990) ("Federal courts have typically extended equitable relief only sparingly. . . . We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights.").

### a. Allegations of Trafficking After December 1, 2023

H.E.W. declares under penalty of perjury that she "specifically remember[s] being at the Orangewood Inn during the winter, toward the end of her trafficking period," and that her final trafficker "brought [her] to the Orangewood Inn approximately five or six times between October 2013 and the end of January 2014." (H.E.W. Decl., Dkt. 172-26, at 1–2). A&D argues that her testimony is inconsistent and that she has "failed to present any corroborating evidence of her being at the A&D Hotel between December of 2013 and February 2, 2014." (MSJ, Dkt. 168, at 20; Reply, Dkt. 174, at 9).

The Court finds that, at the summary judgment stage, H.E.W.'s testimony that she remembers being at the Orangewood "during the winter, toward the end of her trafficking period," i.e., close to February 3, 2014, (H.E.W. Decl., Dkt. 172-26, at 1), is sufficient to raise a fact issue as to whether she was trafficked at the Orangewood Inn on or after December 1, 2023. A party's own testimony, even if self-serving and uncorroborated, may be sufficient to establish a fact issue. *See C.R. Pittman Const. Co. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011) (per curiam) ("A party's own testimony is often 'self-serving,' but we do not exclude it as incompetent for that reason alone. . . . Instead, an affidavit based on personal knowledge and containing factual assertions suffices to create a fact issue, even if the affidavit is arguably self-serving."); *Lester v. Wells Fargo Bank, N.A.*, 805 F. App'x 288, 291 (5th Cir. 2020) (per curiam) (citing *United States v. Stein*, 881 F.3d 853, 959 (11th Cir. 2018)) ("A non-conclusory affidavit can create genuine issues of material fact that preclude summary judgment, even if the affidavit is self-serving and uncorroborated."). Moreover, the Court must believe the evidence of the nonmovant and may not make credibility determinations at this stage. *Anderson*, 477 U.S. at 255; *Reeves*, 530 U.S. at 150. A&D's motion is therefore denied to the extent it has moved for summary judgment based on H.E.W. failing to

produce competent summary judgment evidence of her being trafficked at the Orangewood Inn after December 1, 2013.

### b. Continuing Violations Doctrine

A&D argues in its Motion for Summary Judgment that, as decided by courts in the District of Nevada and Western District of Washington, the continuing violations doctrine does not apply to TVPRA claims. (MSJ, Dkt. 168, at 18–19) (first citing *Christina T. v. Bellagio*, 2025 U.S. Dist. LEXIS 205896, at *7-8 (D. Nev. Oct. 17, 2025); and then citing *Doe v. G6 Hosp., LLC*, 2025 U.S. Dist. LEXIS 76546, at *10-11 (W.D. Wash. Apr. 22, 2025)). A&D also points to the Supreme Court's discussion of the continuing violations doctrine in *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), in which the Supreme Court reasoned that the continuing violations doctrine applies to hostile work environment claims because they are "different in kind from discrete acts. Their very nature involves repeated conduct." *Morgan*, 536 U.S. at 115. Based on this rationale in *Morgan*, A&D contends that "sex trafficking implicates discrete acts, [such that] each discrete act can be actionable on its own," which supports that the continuing violations doctrine should not apply. (MSJ, Dkt. 168, at 19). A&D also asserts that the Supreme Court has "severely limited the continuing [] violations doctrine for federal-based claims to specific employment-discriminations cases." (*Id.* at 18).

In her response, H.E.W. cites to district court opinions that came to the opposite conclusion of the courts cited by A&D—i.e., that held the continuing violations doctrine *does* apply to TVPRA claims. (Resp., Dkt. 172, at 19–20) (citing *Doe (J.R.L.) v. Hilton Domestic Op. Co. Inc.*, No. 24-cv-13227-PBS, 2025 WL 3215615, at *3 (D. Mass. Nov. 18, 2025)). One such court stated: "Most courts have held that TVPRA claims fall within [the continuing violation doctrine]." *Doe (J.R.L.)*, 2025 WL 3215615, at *3. She disagrees that her trafficking was composed of "discrete acts" as argued by A&D and instead contends that her trafficking "consist[ed] of repeated acts forming a

single, ongoing practice." (*Id.*). H.E.W. concludes that because her trafficking at the Orangewood

Inn occurred "on repeated occasions, until early 2014, the continuing-violation doctrine precludes

summary judgment." (*Id.* at 20).

Whether the continuing violations doctrine applies to TVPRA claims appears to be an issue

of first impression in this District. Though it is a close call, the Court ultimately agrees with H.E.W.

The Court rejects A&D's interpretation that *Morgan* strictly limited the continuing violations

doctrine to hostile work environment claims, as the Fifth Circuit stated in an opinion after *Morgan*:

> In its form most commonly deployed in our Circuit, "[t]he continuing violations
> doctrine is equitable in nature and extends the limitations period on otherwise time-
> barred claims." We have dealt with this version most frequently in the employment
> discrimination context, **though we have recognized its potential applicability in
> other areas of law as well**. The Supreme Court has stressed that the equitable
> version of the doctrine should be invoked "sparingly," only when the situation calls
> for it.

*Texas v. United States*, 891 F.3d 553, 562 (5th Cir. 2018) (citations omitted) (emphasis added). The

Fifth Circuit further explained in the context of the continuing violations doctrine that "[g]enerally,

in determining if equitable tolling is appropriate, we focus the inquiry 'on what event, in fairness and

logic, should have alerted the average lay person to act to protect his rights.'" *Id.*

Given the Fifth Circuit's explicit openness to extending the continuing violations doctrine to

contexts out of hostile work environment claims, *see id.*, this Court will not itself automatically

foreclose application of the doctrine. The Court instead follows the Fifth Circuit's instruction to

consider "on what event, in fairness and logic, should have alerted the average lay person to act to

protect his rights." *See id.* H.E.W. has produced competent summary judgment evidence supporting

that victims of sex trafficking are not likely to immediately understand that they were victims of sex

trafficking. (*See* Keyhan Expert Report, Dkt. 172-14, at 7 ("It is widely documented that various

factors make it difficult for survivors and victims to identify themselves as a victim or a survivor.");

*id.* at 9 ("Often there can be a type of Stockholm Syndrome where, due to unequal power, victims

14

create a false emotional or psychological attachment to their controller."); Busch-Armendariz Expert Report, Dkt. 172-6, at 17 (similarly describing how "trauma bonding and Stockholm syndrome . . . complicate a victim's ability to recognize abuse and seek help")).

H.E.W. herself described O.O.'s associate, A.A., as "like a brother to her" to APD officers when she was arrested in February 2014. (APD Investigator Report, Dkt. 172-4, at 10). At her subsequent deposition, H.E.W. testified that she has no memory of calling him "like a brother to her" and stated that she was "probably trying to protect him at the time." (H.E.W. Dep., Dkt. 172-2, at 232:16–233:1). She also told a psychologist that while she was being trafficked, she was coerced into believing that her sex work was "somehow [her] choice," and it did not become clear to her until afterwards that she "was being forced, controlled and manipulated." (Psychological Eval., Dkt. 172-13, at 9).

Based on this testimony from H.E.W. and the supporting expert opinions, the Court finds that—based on the Fifth Circuit's instruction in *Texas v. United States*—it is appropriate to apply the continuing violations doctrine to H.E.W.'s TVPRA claims, as there is evidence in the record supporting the plaintiff's delayed realization of her injury. *See Texas*, 891 F.3d at 562. *See also Le v. New England Swimming*, 795 F. Supp. 3d 193, 199 (D. Mass. 2025) (explaining that "[b]ecause the TVPA is a 'continuing tort,' other courts have found that a TVPA claim arises on the last date the alleged wrongful act of trafficking occurred" and listing cases); *Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 670 (S.D.N.Y. 2024) ("The TVPRA 'involves a continuing tort, and . . . [so] a single act occurring within the limitations period will preserve a claim based on all acts that were part of a single pattern.'"); *Doe (J.R.L.)*, 2025 WL 3215615, at *3 ("Most courts have held that TVPRA claims fall within [the continuing violation doctrine]."). The Court therefore holds that the statute of limitations should be extended on H.E.W.'s TVPRA claims, such that her claim did not accrue until

February 3, 2014, "the last date the alleged wrongful act of trafficking occurred," *Le*, 795 F. Supp. 3d at 199, and none of the events described in Section I, *supra*, are barred by the statute of limitations.

### c. Discovery Rule

In the alternative, the Court considers whether the "discovery rule" also works to extend the limitations on H.E.W.'s TVPRA claims, which again appears to be an issue of first impression for this District. The discovery rule has been applied by the Fifth Circuit in so-called "pure latent injury cases," where the "plaintiffs were victims of postponed awareness of their injury, the cause of their injury, or both their injury and its cause." *Albertson v. T.J. Stevenson & Co., Inc.*, 749 F.2d 223, 231 (5th Cir. 1984). The Supreme Court has stated: "Federal courts, to be sure, generally apply a discovery accrual rule when a statute is silent on the issue." *Rotella v. Wood*, 528 U.S. 549, 555 (2000). The Supreme Court was careful to explain, however, that it is "discovery of the *injury*, not discovery of the other elements of the claim," that begins "the clock." *Id.* (emphasis added).

As explained in Section II(A)(2), *supra*, H.E.W. has submitted expert opinions supporting that sex trafficking victims often do not discover their injury—i.e., that they were victims of sex trafficking—until after their trafficking has ended. (*See* Keyhan Expert Report, Dkt. 172-14, at 7, 9; Busch-Armendariz Expert Report, Dkt. 172-6, at 17). H.E.W. herself told a psychologist that, during her alleged trafficking, she was manipulated into believing her commercial sex work was voluntary, and she did not understand the extent of her alleged traffickers' control over her until later. (Psychological Eval., Dkt. 172-13, at 9). H.E.W. has therefore provided "sufficient evidence for a reasonable jury to conclude that she did 'not become aware of or understand the causes of [her] injuries until . . . later.'" *See A.B. v. Interstate Mgmt. Co., LLC*, No. 3:23-CV-00388-IM, 2025 WL 3254620, at *5–6 (D. Or. Nov. 21, 2025) (quoting *St. Clair v. County of Okanogan*, 154 F.4th 1154, 1156 (9th Cir. 2025)) (reasoning why the discovery rule applies to a TVPRA claim, including the existence of facts in the record supporting that the plaintiff's "'dependence on her [trafficker] and

her shame prevented her from realizing' her injuries" and that a reasonable jury could find she only became aware of the injury she had suffered after receiving therapy). Thus, taking as true H.E.W.'s evidence in the record supporting her "postponed awareness" of her injury, *see Albertson*, 749 F.2d at 231, the Court finds it proper to apply the discovery rule. Regardless of the exact date on which H.E.W. realized the existence of her injury, her injury would not have accrued until after February 3, 2014. Accordingly, none of the events described in Section I, *supra*, are time barred, based either upon the discovery rule or the continuing violations doctrine. The Court will therefore reach the merits of H.E.W.'s TVPRA claim.

### 2. Merits of Doe's Claim

The TVPRA provides sex trafficking victims a cause of action against their traffickers and beneficiaries of their trafficking. The statute provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a). As H.E.W. has claimed that she is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591, (Compl., Dkt. 1, at 3), to state a beneficiary claim under § 1595(a), H.E.W. must ultimately prove that "(1) a venture has engaged in an act in violation of Section 1591, (2) the defendant knew or should have known that the venture had violated Section 1591, (3) the defendant participated in that venture, and (4) the defendant knowingly benefited from its participation." *See*

17

*G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 (7th Cir. 2023).[9],[10] A&D argues that it should be granted summary judgment because A&D did not knowingly benefit from H.E.W.'s allegations of sex trafficking and because A&D did not participate in a venture. (MSJ, Dkt. 168, at 6–10). A&D also appears to dispute that H.E.W. was a victim of sex trafficking at all. (*Id.* at 12–13).

### a. A Venture Which Has Engaged in an Act in Violation of Section 1591

Section 1591 criminalizes causing a "person to engage in a commercial sex act" through "means of force, threats of force, fraud, coercion . . . or any combination of such means." 18 U.S.C. § 1591(a). Section 1595 does not define "venture,"[11] but other courts have defined it as an "undertaking that is dangerous, daring, or of uncertain outcome," or a "business enterprise involving some risk in expectation of gain." *See Doe 1 v. Apple Inc.*, 96 F.4th 403, 414 (D.C. Cir. 2024) (first quoting *Venture*, The American Heritage Dictionary of the English Language (4th ed. 2000); and then citing *Venture*, Black's Law Dictionary (8th ed. 2004)). *See also Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 725 (11th Cir. 2021) (citations omitted) (defining a "venture" as an "undertaking or enterprise involving risk and potential profit").

H.E.W. has testified that each of her traffickers separately used force or the threat of force to cause her to engage in commercial sex acts, after which the traffickers took the money paid by the "johns." (H.E.W. Dep., Dkt. 97:24–25, 98:1–4, 105:10–12; 106:8–10) (allegations regarding I.R.); (*id.*

---

[9] Like the *G.G.* Court, this Court has rearranged the elements of a beneficiary liability claim "to follow a logical sequence rather than the sequence of the phrases in Section 1595," as this sequence seems to be more "useful in instructing juries about the issues they will need to consider in trials under Section 1595 against alleged participants in sex-trafficking ventures." *G.G.*, 76 F.4th at 553 n.5.

[10] It appears that the Fifth Circuit has not discussed the elements necessary to prove beneficiary liability under this statute. *See Doe (T.D.B.) v. G6 Hospitality, LLC*, No. 9:23-CV-00174, 2026 WL 1008529, at *3 & n.4 (E.D. Tex. Apr. 6, 2026) (reviewing the Fifth Circuit's opinions touching on § 1595 and concluding that it has not "substantively engaged with beneficiary liability in the sex-trafficking context").

[11] Though Section 1591(e)(6) defines "venture" as "any group of two or more individuals associated in, whether or not a legal entity," that statutory provision explicitly limits this definition to § 1591 itself. As such, other courts have declined to "import Section 1951's definition into Section 1595," and this Court agrees. *See G.G.*, 76 F.4th at 554; *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724–25 (11th Cir. 2021).

at 121:6–16) (testifying that P.W. made her do "the same thing" as I.R.); (*id.* at 269:9–14; Interr. No. 5, Dkt. 168-1, at 225) (testifying that O.O. tricked her to go to a hotel room to model for photos and was then threatened with physical violence if she did not have sex with customers and that she was never paid by the traffickers for her services). Such acts are surely an "enterprise involving risk and potential profit," such that they qualify as a venture. *See Apple Inc.*, 96 F.4th at 414; *Red Roof Inns, Inc.*, 21 F.4th at 725. The Court rejects A&D's near-frivolous argument that "[n]either force, coercion, nor fraud drove [her] into the commercial sex trade" because her "addiction to drugs drove her into the trade" since at least 2011, when she worked at strip clubs and massage parlors. (MSJ, Dkt. 168, at 12–13). As A&D surely knows, at the motion for summary judgment stage, the Court must "give credence to the evidence favoring the nonmovant." *Reeves*, 530 U.S. at 150. The Court therefore takes as true H.E.W.'s testimony that her commercial sex acts between July 2013 and February 2014 were forced. Whether her prior employment in a strip club and massage parlor leads to the inference that the actions alleged in this lawsuit were voluntary is a matter for the jury, not the Court. *See id.* (quoting *Anderson*, 477 U.S. at 255) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). H.E.W. has therefore raised a genuine fact issue as to whether her traffickers were engaged in a venture that violated § 1591.

### b. Knowledge or Constructive Knowledge that the Venture Had Engaged in an Act in Violation Section 1591

Next, the Court considers whether H.E.W. has raised a fact issue as to whether A&D "knew or should have known," 18 U.S.C. § 1595(a), that her traffickers had engaged in violations of Section 1591. The Court will review the evidence in the record as to the three alleged traffickers separately.

First, regarding I.R., H.E.W. has sufficiently raised a fact issue as to whether A&D knew or should have known that she was being trafficked. She testified that when she was first brought to

19

the Orangewood Inn by I.R., she was "badly bruised," including that she had "[b]lack eyes" and had bruises "all over [her] arms and [her] face." (H.E.W. Dep., Dkt. 172-2, at 103:16–20). Given that H.E.W. testifies she saw "a front desk person" when she and I.R. were checking in to the hotel, the Court reasonably infers as it must that this Orangewood Inn employee would have seen her numerous bruises, including her black eyes. *See Reeves*, 530 U.S. at 150 ("[T]he court must draw all reasonable inferences in favor of the nonmoving party."). Two of H.E.W.'s experts state that injuries are a red flag for trafficking. (Busch-Armendariz Expert Report, Dkt. 172-6, at 25, 33; Keyhan Expert Report, Dkt. 172-14, at 15).

H.E.W. also stated that she saw three to four "johns" per day and spent "six to eight nights total" at the Orangewood Inn during this period. (H.E.W. Dep., Dkt. 172-2, at 109:3–19, 110:1–7,115:11–13). Desai testified that his staff were trained to look out for this type of traffic to and from rooms and that they watched hallway cameras for this type of suspicious activity. (Desai Dep., Dkt. 172-7, at 61:18–62:4, 104:21–105:4). Unusual "flow of traffic" into and out of a room is a sign of trafficking. (Busch-Armendariz Expert Report, Dkt. 172-6, at 33 ("Multiple known red flags for human trafficking were evident in the case . . . . a continuous flow of non-guests (johns) flowed in and out . . . ."). It is therefore a reasonable inference that hotel employees saw this unusual "flow of traffic" in and out of H.E.W.'s room, which they should have known was another sign of trafficking.

Moreover, H.E.W. claims that she asked for extra towels daily, including for stays for up to four nights, and that housekeeping never entered her room, despite a policy requiring housekeeping to enter rooms at least every two days. (H.E.W. Dep., Dkt. 172-2, at 197:22–198:3; Desai Dep., Dkt. 172-7, at 69:2–25, 70:6–12). H.E.W.'s repeated requests for extra towels, in combination with her keeping a do-not-disturb sign on her door, should have been a red flag to the Orangewood Inn staff. (*See* Keyhan Expert Report, Dkt. 172-14, at 14 (stating that motel staff should be trained to recognize that a guest frequently using a do-not-disturb sign or refusing cleaning service for

extending periods are red flags for trafficking); *id.* at 15 (stating that a guest's requests for more housekeeping items than normal while not allowing staff to enter their room is a red flag for trafficking)).

Second, the Court finds that H.E.W. has not raised a genuine fact issue as to A&D's knowledge or constructive knowledge during the period of time H.E.W. testifies she was trafficked by P.W. H.E.W. testifies that she cannot remember being trafficked by P.W. at the Orangewood Inn—or any specific hotel—so she has failed to raise a fact issue supporting that A&D knew or should have known that P.W. was trafficking her. (*See* H.E.W. Dep., Dkt. 172-2, at 126:3–10; *see also* Resp., Dkt. 172, at 4 (acknowledging that only "[t]wo of her traffickers independently selected [the Orangewood Inn]" as a venue for trafficking her)). The Court will therefore grant A&D's motion for summary judgment relating to the time period during which H.E.W. was allegedly trafficked by P.W.

Finally, the Court finds that H.E.W. has raised a fact issue as to A&D's knowledge or constructive knowledge of her trafficking by O.O. Like during her time with I.R., employees of the Orangewood Inn would have or should have seen unusual traffic of men who were not registered guests of the hotel going into and out of her room. (H.E.W. Dep., Dkt. 172-2, at 196:2–7 (testifying that three or four johns per day came to her hotel rooms during this period)). H.E.W. also states that during this time period she personally extended her room rental at the Orangewood Inn with cash and personally requested additional towels (approximately two to three) daily. (*Id.* at 197:1–198:3). Paying for rooms with cash (including extending room reservations one day at a time) and requesting extra housekeeping items are red flags for trafficking. (Keyhan Expert Report, Dkt. 172-14, at 15). H.E.W. additionally testifies that O.O. held "after parties" as a "regular thing" at the Orangewood Inn and that there was "rampant drug use." (Interr. No. 11, Dkt. 168-1, at 269; H.E.W. Dep., Dkt. 172-2, at 384:15–385:4, 386:4–10). An excessive amount of illegal drugs in a

21

hotel room is another sign of trafficking. (Polaris Project, Dkt. 172-15, at 3; Busch-Armendariz Expert Report, Dkt. 172-6, at 16 (stating that drugs are "often used during the recruitment and exploitation phases of human trafficking")). Viewing these facts in a light most favorable to H.E.W., it is a reasonable inference that staff at the Orangewood Inn knew or should have known that O.O. was trafficking H.E.W.

### c. Participation in the Venture

"[P]articipation" is not defined in § 1595. Courts have interpreted the omission of a definition under § 1595(a) in different ways. Because § 1595(a) imposes liability where a defendant "knew or should have known" about the violation, most courts have taken the position that Section 1591's actual knowledge requirement cannot be imputed onto the term as used in Section 1595(a). *See Lundstrom v. Choice Hotels Int'l, Inc.*, No. 21-CV-00619-PAB-SKC, 2021 WL 5579117, at *3 (D. Colo. Nov. 30, 2021) ("[D]efendant is mistaken that a plaintiff bringing a civil claim under § 1595 must plausibly allege each element of criminal liability under § 1591."); *A.B. v. Hilton Worldwide Holdings, Inc.*, 484 F. Supp. 3d 921, 935 (D. Ore. 2020) ("If we imputed [§ 1591's] standard into section 1595 . . . we would ignore [§ 1595's] 'knew or should have known' language."); *E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 427 (N.D. Tex. 2021) (collecting cases for same holding). A minority of courts have taken the stricter position, imposing a requirement of actual knowledge to support liability. *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018) ("Plaintiff must allege specific conduct that furthered the sex trafficking venture. Such conduct must have been undertaken with the knowledge, or in reckless disregard of the fact, that it was furthering the alleged sex trafficking venture."); *see also Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

Although the Fifth Circuit has yet to rule on the issue, the Seventh and Eleventh Circuits have found that Section 1591's strict knowledge requirement should not be imported into Section 1595, and this Court agrees. *See G.G.*, 76 F.4th at 558; *Red Roof Inns, Inc.*, 21 F.4th at 724. *See also M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 969 (S.D. Ohio 2019) (reasoning that, though the "participation" in § 1591 must be "knowing," that strict knowledge requirement should not be imported in § 1595, because doing so would "void the 'known *or should have known*' language of § 1595") (emphasis added). This Court also agrees with the Seventh Circuit that, because a civil defendant may be liable as a beneficiary without itself having committed a criminal violation of § 1591, "'participation in' that venture need not involve direct participation in the sex trafficking itself." *See G.G.*, 76 F.4th at 559. As such, a plaintiff may survive summary judgment by producing evidence that leads to a reasonable inference that the trafficker and the hotel had a "continuous business relationship . . . such that it would appear that the trafficker and the hotel[] ha[d] established a pattern of conduct or could be said to have a tacit agreement." *M.A.*, 425 F. Supp. 3d at 970.

H.E.W. has testified that she saw I.R. and O.O. tipping staff at every hotel they trafficked her at. (H.E.W. Dep., Dkt. 172-2, at 264:16–265:3). Such testimony, viewed in combination with testimony supporting that Orangewood Inn staff failed to follow multiple policies and ignored numerous instances of suspicious behavior—i.e., ignoring the unusual traffic of men in and out of her room; allowing H.E.W. to have new towels daily without allowing in housekeeping for many days; ignoring H.E.W. being "badly bruised"; ignoring signs of drug use—leads to a reasonable inference that the Orangewood Inn had a tacit agreement of allowing I.R. and O.O. to "go about their business" without interruption. The Court finds this evidence is sufficient to raise a fact issue as to whether A&D participated in I.R.'s and O.O's "ventures."

### d. Knowing Benefit

Finally, the Court must determine whether H.E.W. has raised a fact issue regarding whether A&D knowingly benefitted from the venture. Other courts, including one in this District, have found that the "rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard." *See Doe v. Wyndham Hotels & Resorts, Inc.*, No. 1:24-CV-00109-DAE, 2024 WL 4224915, at *3 (W.D. Tex. Aug. 30, 2024); *M.A.*, 425 F. Supp. 3d at 965.

A&D disputes "(1) that Plaintiff was trafficked at the A&D hotel and (2) that the alleged traffickers paid for rooms at the A&D hotel." (MSJ, Dkt. 167, at 6). But H.E.W. has provided sufficient testimony that she was forced into having sex with men by I.R. and O.O. at the Orangewood Inn. She has also testified that she had no money during this time period and did not have a credit card at the time,[12] (H.E.W. Dep., Dkt. 172-2, at 111:8–9, 113:19–22, 124:11–13, 249:4–8, 262:8–10, 269:9–12), allowing the Court to reasonably infer that her alleged traffickers paid for the hotel rooms or that, if H.E.W. herself handed over money to check into a room or extend a reservation, the cash used had been the profits of her trafficking. H.E.W. has therefore raised a fact issue as to whether A&D knowingly benefitted from her alleged trafficking. Finding that H.E.W. has raised a fact issue as to all elements of her § 1595 beneficiary liability claim, the Court will deny A&D's motion for summary judgment.

### B. Motion for In Camera Review and to Seal Portions of Deposition Testimony

A&D moves for the Court to review in camera portions of the deposition transcript of its expert witness, Rachel D. Fischer ("Fischer"), and to seal portions of the deposition transcript (Mot., Dkt. 170). Fischer is a "forensic nursing expert" whose "opinions concern standards, industry

---

[12] It was the Orangewood Inn's policy to require guests checking into the hotel to provide a credit card. (Desai Dep., Dkt. 172-7, at 78:6–11).

practices, and what hotel staff could reasonably have observed." (*Id.* at 7). A&D argues that H.E.W.'s counsel "subjected her to immaterial, impertinent, and deeply invasive questioning regarding [her] personal history as a childhood sexual abuse survivor and victim of human trafficking." (*Id.* at 1). It further contends that her "personal experiences did *not* form any basis for her expert opinions in this case and should not become public record." (*Id.*). A&D asserts that making the entirety of Fischer's deposition testimony public would "caus[e] significant and ongoing harm to Ms. Fischer's privacy interests, professional work capacity and personal well-being, as well as serving to discourage qualified experts from participating in human trafficking litigation."[13] (*Id.* at 2). Though Fischer "has spoken publicly as a survivor," A&D represents that "she has not publicly disclosed the specific details" asked about by H.E.W.'s counsel, such as "the names of her traffickers, the number of 'pimps' she had, whether she was subjected to specific sexual acts, and the details of her childhood rape." (*Id.*).

H.E.W. responds that Fischer's website, https://legalrnconsult.org/, "specifically states '[Fischer] shares her story and gives examples of trials and traumas that she went through, such as . . . being a victim of commercial sexual exploitation.'" (Resp., Dkt. 175, at 2). Her website also purportedly "contains a clip of an interview that talks about her rape as a child." Given that the instant case is also about alleged commercial sexual exploitation, H.E.W. argues that it is "nonsensical to think her opinions are not also based on her own experiences," such that her counsel "was entitled to ask questions about her personal experiences as a victim." (*Id.*). H.E.W. also points out that A&D never objected to the questions it now seeks to seal her responses, never instructed her to not answer, and never moved to terminate the deposition for being unreasonably embarrassing. (*Id.*).

---

[13] A&D represents that "attorneys in other cases routinely request [Fischer's] prior transcripts of depositions or trial testimony to review her testimony and qualifications." (*Id.* at 6).

The Court finds it highly plausible that Fischer's personal experiences as a victim of sex trafficking inform her expert opinions on the matter, making her personal experiences relevant to her opinions and to her qualifications. Moreover, Fischer does speak publicly regarding her general experiences as a victim, such that some of this information is already public. The Court will therefore allow H.E.W. to question Fischer generally about her experiences (e.g., when it happened, for how long it happened, if it occurred at hotels).

The Court agrees with A&D, however, that certain questioning was overly invasive and bears no relation to this case. Given that H.E.W. herself was never questioned regarding which specific sexual acts she was forced to perform by her traffickers, any specific sex acts Fischer had been forced to perform are not relevant. The specific names of her traffickers are also not relevant to this action, nor is the exact number of her traffickers. Any probative value of these details relating to Fischer's opinions or qualifications is outweighed by Fischer's interest in keeping embarrassing or overly personal, graphic information private.

The Court will therefore order that any deposition testimony relating to details about "the names of her traffickers, the number of 'pimps' she had, whether she was subjected to specific sexual acts, and the details of her childhood rape," be redacted.[14] The parties are encouraged to confer and agree upon which specific lines of the deposition should be redacted. If the parties are unable to agree regarding redactions, this topic may be raised at the Final Pretrial Conference scheduled for June 4, 2026. The Court will also order that H.E.W.'s counsel may not question Fischer regarding these details or otherwise refer to these portions of her deposition testimony.

---

[14] The Court finds that sealing Fischer's deposition testimony is unnecessary and that redaction of these portions of the testimony is sufficient. *See Ahsani*, 76 F.4th at 453 ("[R]edaction is often practicable and appropriate as the least restrictive means of safeguarding sensitive information. . . .").

26

## IV. CONCLUSION

For the reasons stated above, **IT IS ORDERED** that Defendant A&D's Motion for Summary Judgment, (Dkt. 168), is **DENIED**.

**IT IS FURTHER ORDERED** that A&D's Motion for In Camera Review, (Dkt. 170), is **GRANTED**, such that the Court has reviewed the provided depositions excerpts in camera.

**IT IS FURTHER ORDERED** that A&D Motion to Seal Portions of Deposition Testimony, (Dkt. 170), is **GRANTED IN PART** and **DENIED IN PART**, such that the portions of Fischer's deposition testimony relating to details about "the names of her traffickers, the number of 'pimps' she had, whether she was subjected to specific sexual acts, and the details of her childhood rape," shall be **REDACTED**.

**IT IS FINALLY ORDERED** that H.E.W.'s counsel is prohibited from referring to, alluding to, disseminating, or mentioning the above-described invasive questioning and the expert's responses in any context, except that H.E.W.'s counsel may ask general questions regarding Fischer's personal experiences as a victim of sex trafficking.

**SIGNED** on May 19, 2026.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE